The Buffalo Loan, Trust and Safe Deposit Company, Respond-ent, *v.* The Medina Gas and Electric Light Company and The Holland Trust Company, Appellants.

*Corporation — negotiation of bonds by the owner of all except two shares of its stock — acquiescence of the directors — bona fide purchaser — when advances are made to a corporation and not to a member of it — diversion of bonds — how far a corporation is an entity separate from its members — interest does not run on past-due coupons.*

In an action brought to foreclose a mortgage, given by the Medina Gas Light Com-pany, a corporation composed of three persons, named Robertson, Dayton and Stranahan, of whom the last named owned 298 shares of the 300 shares of its capital stock, it appeared that in 1886 the board of directors declared, by reso-lution, that it was necessary for the company to borrow $10,000, and directed the issue and negotiation of bonds to that amount (secured by a mortgage to the plaintiff), to be negotiated by Robertson, the president — such bonds to be attested by Stranahan, the secretary. On the day when the gas company exe-cuted the mortgage, Stranahan delivered all the bonds to the plaintiff, which advanced to him upon them $6,000, and also took from him his individual note for that amount. Three days later the plaintiff executed and acknowl-edged the mortgage in evidence of its acceptance of the trust. Subsequently Stranahan received from the plaintiff further advances upon the bonds, to secure which he also repledged certain stock, already pledged, for prior loans made to him by the plaintiff. In 1888 an employee of the gas company, named Alport,

recovered a judgment against it, and as a consequence the plaintiff, in 1889, brought an action against the gas company to foreclose its mortgage, but the claim was settled and the foreclosure action was discontinued.

In 1890, the German-American Bank, at the request of Stranahan, who was its debtor, paid the plaintiff its advances to Stranahan, and took the pledged bonds and all the collateral securities, eight of the coupons attached to the bonds being at the time past due and unpaid. The present action was prosecuted for the benefit of the bank, the legal owner of the bonds, against the present defendant, which had succeeded to the ownership of the mortgaged premises.

*Held*, that the bonds had a valid inception, notwithstanding the fact that they were negotiated by Stranahan instead of by Robertson, as directed in the resolution;

That, as Stranahan owned all the capital stock except two shares, which were, as the evidence tended to show, held by others, who were mere nominal directors, for him, and controlled the corporation, and as the other directors had acquiesced in his acts during several years, and must have known certainly when the foreclosure suit was commenced, in 1889, that the bonds had been issued and negotiated, the corporation could not at this time repudiate Stranahan's acts. The idea that a corporation is a separate entity in the sense that it can act independently of the natural persons composing it, or abstain from acting where it is their will that it shall, has no foundation in reason or authority, and is contrary to the fact;

That the plaintiff, the original purchaser of the bonds, assumed no greater risk by his failure to make inquiries at the time of the purchase than the burden of proving that the facts, which he could have discovered by inquiry, would have protected him;

That, where an officer of a corporation, who practically owns it, and has power to raise money upon its negotiable bonds, presents such bonds to a trust company and receives a loan upon them, the advances thus made, although further secured by the individual note of the officer, will be deemed to have been made to the corporation and not to the officer individually;

That under such circumstances the lender is under no obligation to see that the moneys thus loaned are applied to the purposes of the corporation.

*Semble*, that if it were material to determine whether the corporation received the moneys, the burden would be upon the corporation to show that it did not, and thus establish a wrongful diversion of the bonds;

That it was erroneous to allow the bank to recover interest upon past-due coupons which remained attached to the bonds in its hands.

APPEAL by the defendants, The Medina Gas and Electric Light Company and another, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Orleans on the 22d day of June, 1895, upon the report of a referee.

This action was brought to foreclose a mortgage executed by the Medina Gas Light Company to the plaintiff, as trustee, under date of September 15, 1886, upon allegations that the mortgagor had defaulted in the payment of the interest upon ten bonds, secured by the mortgage, which bonds, it is alleged, were the property of the German-American Bank of Buffalo, at whose instance the action was brought.

The defendants, by their answer, deny the material allegations of the complaint, and especially allege that none of the bonds was ever issued or negotiated by said company ; that the said bank never became the *bona fide* owner or holder thereof, and that no indebtedness exists for which the mortgage can stand as security.

The principal and material facts are these : At the time of the execution and delivery of the mortgage and of the bonds, Mr. Stranahan was the owner of all the capital stock of the company, excepting two shares, one of each of said shares being held by two other persons named Dayton and Robertson, who, with Stranahan, constituted the directors of the company.   Robertson was the president and Stranahan was the secretary.   These shares were given to them respectively by Stranahan, to qualify them as directors, as stated by a witness for the defendants.

It appears that the affairs of the company were principally conducted by Mr. Curry, its superintendent, who took charge of the gas works, collected all of the meter rents and other moneys owing to the corporation, purchased all supplies and disbursed all moneys necessary to pay the obligations of the company.   Stranahan was also engaged in other operations, including the management of the Tonawanda Gas Light Company and the Genesee Hotel at Buffalo, but left it to Curry to do all that was necessary for the successful management of the business of the Medina company.

At a meeting of the board of directors held on September 11, 1886, a resolution was adopted, to the effect that it had become necessary for the company to borrow the sum of $10,000 for the purpose of defraying its existing indebtedness and for its other lawful purposes, and that, for the purpose of borrowing such money, it would execute and negotiate its ten bonds, for the sum of $1,000 each, payable in twenty years, with interest at the rate of six per cent per annum, payable semi-annually, and that to secure the pay-

ment of such bonds, it would execute and deliver to the Buffalo Loan, Trust and Safe Deposit Company a mortgage upon all its property. The resolution further provided that the president should prepare the bonds and mortgage ; that the secretary should attest the same, and that the president should "make delivery of such mortgage and negotiate the said bonds upon the best terms possible." This resolution was set forth *in extenso* in the mortgage, which expressly provides that the mortgagee named as trustee shall join in the mortgage and accept the trust created by it, and that the bonds issued pursuant thereto shall be identified by its signature to a certificate indorsed upon each of the bonds. The mortgage was acknowledged by the president and secretary of the company on the 18th day of September, 1886, and by the plaintiff trust company three days later.

It appears from the testimony of Mr. Clark, the secretary of the plaintiff, that on the day he acknowledged the mortgage and signed the certificate upon the back of the ten bonds, Stranahan presented to him the bonds and mortgage, and delivered the same to him, and, at the same time, the plaintiff advanced to Stranahan, upon the security of the bonds, the sum of $6,000, and took therefor his individual promissory note, and, from time to time thereafter, advanced certain sums to him, retaining the bonds as collateral for such indebtedness. At the same time, Stranahan repledged certain stock of the Tonawanda Gas Company, which he had previously pledged for a prior loan. In December, 1890, the amount of Stranahan's indebtedness to the plaintiff reached the sum of $14,650.

Some time in 1888 one Alport was injured by an explosion in the gas works, and brought an action against the company, which resulted in a judgment. Thereupon, at the request of Stranahan, the plaintiff brought an action in December, 1889, to foreclose this mortgage, but a settlement with Alport, who was made a party defendant in the foreclosure action, having been subsequently reached, the action was duly discontinued.

In December, 1890, Stranahan, who, up to that time, continued to be the owner of nearly all the capital stock of the mortgagor company, stood indebted to the German-American Bank in the sum of about $9,000. The bank commenced proceedings against him, as a non-resident, by attachment, and levied upon Stranahan's equity in the ten bonds in the possession of the plaintiff, and also upon said Tona-

wanda Gas Company stock. It appears that, for some reason, this attachment was withdrawn and the action discontinued. At the request of Stranahan, the German-American Bank paid to the plaintiff the sum of $14,650, that being the amount in which he was indebted to the plaintiff for moneys advanced upon the ten bonds in question and the said Tonawanda Gas Company stock, and the plaintiff turned over to the bank the said bonds and stock, and surrendered to it the dishonored notes of Stranahan. The total amount which thus became owing by him to the bank was $23,000.

At the time the bank acquired these bonds, there were attached to each eight unpaid coupons, and so appeared when offered in evidence. Thereafter Stranahan, from time to time, made various payments to the bank on account of the claims which it held against him and reduced his indebtedness to $15,000, for which amount he gave his note, dated March 31, 1891. This note recited that there were deposited, as collateral security for its payment, 305 shares of Tonawanda Gas Company stock. Prior to this time, and, it would seem, in the fore part of 1891, Stranahan transferred to Mr. Linley all of his stock in the mortgagor company and notified the bank that Linley desired to obtain the $10,000 bonds. It was thereupon agreed between the bank, Stranahan and Linley that Stranahan should give his notes to the bank, indorsed by Linley, for the sum of $10,000; that the bonds should be held as collateral to the notes, and upon payment of the same the said sum of $10,000 was to be applied upon Stranahan's indebtedness to the bank, and thereupon the bonds would be delivered to Linley.

The notes were accordingly given and various payments were made upon them, but not sufficient to satisfy all the notes and entitle Linley to the bonds.

Subsequently, and in April, 1891, the mortgagor company was consolidated with the Medina Electric Company under the name of the defendant company, which became the owner of the property covered by the mortgage. Mr. Curry testified that Linley owned all the stock in the mortgagor company, and gave him one share, so he could be made a director in the present corporation. After the consolidation was effected, a mortgage was executed to the defendant, the Holland Trust Company, to secure the payment of certain bonds thereupon issued.

*Louis Marshall,* for the appellants.

*Tracy C. Becker,* for the respondent.

GREEN, J. :

1. Contention is made by appellants' counsel that the mortgage in suit never having been personally delivered by Mr. Robertson, the president, and the bonds not having been negotiated by him, they never became binding obligations upon the mortgagor company ; that the bonds never had a valid inception until they were negotiated in the manner provided by the resolution authorizing their execution ; that the resolution required as condition precedent to the creation of any liability, that the president should negotiate the bonds upon the best possible terms ; that the president must have been named for a purpose, *i. e.,* the protection of the corporation, so that the future, as well as the present stockholders, should derive some consideration or benefit therefrom ; that the president was, therefore, prevented from negotiating the bonds " upon the best terms possible," or upon any terms, and the bonds were never put into circulation through the agency of the corporation, but were practically stolen by the secretary, Stranahan, who received the manual possession thereof from the trust company after it had certified the same ; that Stranahan was not authorized to negotiate the bonds at all, but Robertson alone was authorized.

This contention is clearly untenable. Stranahan, was practically the owner of the entire capital stock of the company, and, if we are to believe the testimony of Curry, the superintendent, the other two directors took no active part in the management or control of its business affairs. The strong inference from his testimony and from the circumstances of the case is, that they were "figureheads " and nominal stockholders and directors, subject to the control of their creator, and the mere creatures of his will. Evidently it was a matter immaterial to them whether they should negotiate the bonds, or the virtual owner of them and of the corporation itself should do so ; they knew, or must have known, that Stranahan negotiated the bonds, and their acquiescence is evidenced by long lapse of time and circumstances presented. If they did not actually know that Stranahan had the mortgage recorded and had disposed of the bonds, they did not care ; it was none of their par-

ticular business, for they had but very little interest to protect. Stranahan and Curry managed the whole business. Robertson and Dayton could not presume to interfere and object to the acts of the owner of the company. During all these years Dayton and Robertson remained silent. Silence may give consent, and long acquiescence must, under such circumstances, be sufficient evidence of authority. This action has afforded them the opportunity to come forward and testify as to what they do not know in respect to the matters in controversy, but it appears that the defendants have not thought it advisable to produce any of the directors as witnesses to establish their defense. Surely, when the trust company brought the foreclosure suit in December, 1889, at the request of Stranahan and for the purpose, it would seem, of cutting off Alport's judgment, these nominal directors must have known of the institution of that suit, and consequently the disposition of the bonds which three years before they had authorized to be issued and negotiated. Let it be assumed that it was incumbent upon the trust company to make inquiry of the other directors as to whether they would permit Stranahan to negotiate the bonds, or insist that the act be performed by the president, what would have been the answer? In view of all the circumstances and condition of things now disclosed, and, particularly the peculiar relationship existing between the subordinate directors and their superior, could it reasonably be inferred or presumed that the holders of the two shares of stock would refuse to authorize the owner of 298 shares to negotiate the bonds?

The general doctrine is, that the purchaser of a negotiable instrument, who purchases under circumstances which throw upon him the duty of making inquiry as to its validity, assumes no greater risk by his failure to inquire than the burden of proving that the facts which he could have discovered, had he inquired, would have protected him. ( *Wilson* v. *Met. Elev. Ry. Co.,* 120 N. Y. 145.)

"Therefore, if the plaintiff, when charged with the duty of making inquiry, had actually done so, whatever its officers prosecuting the investigation would naturally have discovered, according to any permissible inference from the evidence, it can now invoke to establish the implied authority of Mr. Stone. What could the jury have found in this regard within the rules governing their powers,

if the case had been submitted to them for decision?" (*Hanover Bank* v. *American Dock, etc., Co.*, 148 N. Y. 612, 622; 75 Hun, 55, and see *Cheever* v. *Pittsburgh, etc., R. R. Co.*, 150 N. Y. 59.)

The conclusion is fully warranted by the evidence that Stranahan was lawfully in possession of the bonds, and with ample authority to dispose of them. The suggestion made, that the president was designated in the resolution as the officer to negotiate the bonds, so that the "company" might be protected from the loss to be expected and anticipated if they should be intrusted to Stranahan, is, in the light of the evidence presented, very suggestive, but nothing more. Whether or not the compliment is justly deserved we are unable to say; nor is there much weight in the suggestion that the secretary practically stole the bonds of which he was the virtual owner.

2. It is argued with some show of reason that Stranahan never negotiated nor pledged the bonds for or on behalf of the company, but rather on his individual behalf and credit, and for his own individual purposes; that the moneys were advanced to and received by him, not while acting for the company, but while acting in his individual capacity, and for the accomplishment of his own private objects; and it is insisted that this contention is strengthened by the circumstance that there is no evidence that any of these moneys so received, were ever used for, or applied to, the purpose of defraying the existing indebtedness of the company, or "for its other lawful purposes," or that the company ever received any advantage or benefit therefrom; but it is claimed that the evidence indicates the contrary.

The referee truly says that the trust company acted in a dual capacity; as trustee for the bondholders, it had certain duties to perform, and as a banking corporation, it had the right to loan money upon securities, and it made no practical difference whether it was named as trustee in the security, except so far as it was chargeable with notice of any diversion of such securities. If the plaintiff had never parted with these bonds, could it maintain this action in its own behalf as a *bona fide* purchaser or pledgee of the bonds? The referee says not; and the reasons given for his conclusions are, that when the bonds and the mortgage were presented to the plaintiff, it was apparent that they had never been negotiated by the president, as required by the resolution recited in the mortgage; that the

plaintiff had not at that time accepted the trust, and the resolution itself required that the bonds should be certified by the plaintiff; that the instruments were, therefore, both incomplete when presented, and the plaintiff was chargeable with knowledge that they had never been negotiated in accordance with the terms of the resolution, and there was no presumption and no evidence before plaintiff's officer that Stranahan had any authority to pledge them for his own individual debt; that the plaintiff, therefore, in its capacity of a banking corporation, was not a *bona fide* purchaser of the bonds, nor did it take any title to the same as against the mortgagor, for the transaction constituted a diversion of the bonds from the purposes for which they had been issued.

The answer to this reasoning is that Stranahan did, in fact, possess authority from his co-directors and stockholders, who, with himself, constituted the corporation and owned all its assets, to negotiate the bonds; consequently, the matter must be judged as though the secretary, instead of the president, were designated in the resolution for such purpose. If the co-directors had been asked whether Stranahan, who was the virtual owner of the bonds, was authorized to receive advances upon them, what would have been the answer? What could they have answered? During the period of four years the plaintiff held these bonds and made further advances upon them, and no one interested in the company as stockholder ever questioned its title. That the nominal directors and stockholders must have known that Stranahan had disposed of the bonds and received the money is clearly evident; they could not have been ignorant of the foreclosure suit in December, 1889; they knew the bonds and mortgage were outstanding and uncanceled. Perhaps, however, they knew nothing about it and cared less, as it was none of their concern. Stranahan was the corporation itself, and practically owned all its stock and property, and was, therefore, the very proper person to dispose of the bonds.

The case, then, is simply this: An officer of a corporation, with full power to raise money upon its negotiable bonds, presents them to a bank and asks for a loan of money upon the strength of them; the bank complies, and also takes from him his individual note and other collateral, and the question is, whether the moneys were advanced to him in his individual character or as a representative of

the corporation. Because of the acceptance of his personal promissory notes and other collateral must the transaction necessarily be characterized as an individual loan? That the advances were made to some extent, and, it would seem, to a great extent, on the strength of the bonds and mortgage, is a very reasonable presumption. The taking of individual security cannot impair the legal effect or consequence of that transaction. (See 65 Fed. Rep. 455, quoted *post.*)

Presumably the taking of the note and the other collateral may have been induced by the consideration that the president was the person authorized by the resolution to negotiate the bonds; and the plaintiff may have entertained some doubts in respect to the validity of the transaction with the secretary, although being aware, no doubt, that he was the principal stockholder.

Now, since the advances were made upon the faith and strength of the bonds and mortgage, and that Stranahan was authorized to receive the money for the company, payment to him was payment to the corporation itself. The corporation was then present at the time of the transaction, and received the moneys through its representative, and by means of the statement in its corporate obligations that the funds were desired for corporate purposes.

In contemplation of law, therefore, the funds came into possession of the company, and, that being the case, the plaintiff was under no obligation to see to it that the moneys were applied to the purposes for which the obligations were issued, and, consequently, it is not responsible for their misapplication, and it is immaterial, therefore, what Stranahan did with the moneys of which he was virtually the individual owner. Clearly the referee's conclusion, that the transaction amounted to a diversion of the securities, is founded in error.

" It was not sufficient to allege that the books of the company did not show value received for the bonds, or that the president had not made a return of the proceeds to the company. The bonds were in such form as to pass by delivery; a purchaser had simply to pay his money and take his bond; he was not bound to see to the application of the money to the purposes of the corporation; he might presume that they had sufficiently provided for their own safety in that matter. The allegation is not that the bonds were obtained fraudulently and without being paid for, nor that they were not in

fact paid for to the proper officer or officers of the company, but only that the books do not show what had become of the proceeds. This was clearly insufficient." (*Phil., etc., R. R. Co.* v. *Lewis*, 33 Penn. St. 33 ; and see Jones Corp. Bonds, §§ 186, 201.)

If it were a matter of any importance to determine whether the company received, directly or indirectly, any benefit from the moneys loaned, the question would arise, upon whom is the burden of proof ? The answer would be upon the defendants ; and that obligation they have not performed, by reason of their not calling a person who must be able to give material information on the subject. If there is information which might have been but is not forthcoming, and which might have been very material, who ought to have produced it upon this trial ? The burden of producing it lies upon the parties who have to make out their case, and those parties in this instance are the defendants.

The plaintiff has the legal title and is entitled to keep it, unless it can be shown that there are equitable grounds upon which it should be deprived of it. In whatever position we might have been if better evidence could not have been produced, we must decline to draw inferences as to matters upon which evidence might have been brought before us. (*Bentinck* v. *London Joint Stock Bank*, 2 Ch. Div. [1893] 120, 136, 137.)

The testimony of Curry, the superintendent of the company, falls short of proving that the company could have received no benefit from the moneys. No excuse is shown why the directors or officers, and especially Stranahan, were not produced as witnesses.

" ' All evidence  *  *  *  is to be weighed according to the proof which it was in the power of one side to have produced and in the power of the other side to have contradicted.' ". (See *Kirby* v. *Tallmadge*, 160 U. S. 379 ; *McGuire* v. *Hartford Fire Ins. Co.*, 7 App. Div. 575, 589, 591.)

The finding of the referee, that there is no evidence that any of the moneys advanced to Stranahan were ever applied to corporate purposes, is based on the erroneous assumption that he had no power to negotiate the bonds and receive the moneys on behalf of the company ; that the transaction was a personal one, and the pledge amounted to a wrongful diversion of the bonds ; and that, therefore, the burden was imposed upon the plaintiff to call Stranahan and

establish, if it could, the application of the moneys to the benefit of the company.

The position taken by appellants appears to be that the company could not have received any benefit from the funds, because, forsooth, the superintendent of the company says they did not need them. And it is argued that in September, 1886, the company's plant was entirely paid for; that it was entirely out of debt, and was in receipt of an income from its customers which was entirely sufficient to pay for all the improvements that were needed and that were contemplated. If that be true, then the resolution recited in the mortgage was a lie. Besides, as respondent's counsel has pointed out, the testimony of Curry shows that the income was insufficient for the necessities of the business.

Conceding that the plaintiff was bound to have made inquiry as to whether the secretary was authorized to receive the moneys, as the result of the inquiry would have shown that he possessed such authority, the plaintiff would be protected in making the advances; and the fact that it made no inquiry will not place it in any different position than it would have occupied had inquiry been made. (See *Wilson* v. *Met. Elev. R. Co.*, and *Hanover* case, *supra*.)

In view of the fact that Stranahan was practically the owner of the entire capital stock, and the corporation was virtually his private property, and in the light of all the circumstances disclosed in respect to his transactions, the court must not carry too far the legal conception that a corporation is to be regarded as a legal entity, existing separate and apart from the natural persons composing it.

" The statement that a corporation is an artificial person or entity, apart from its members is merely a description in figurative language of a corporation viewed as a collective body ; a corporation is really an association of persons, and no judicial dictum or legislative enactment can alter this fact." (Morawetz on Corp. § 227.)

So that the idea that a corporation may be a separate entity, in the sense that it can act independently of the natural persons composing it, or abstain from acting, where it is their will that it shall, has no foundation in reason or authority, and is contrary to the fact. (*State* v. *Standard Oil Co.*, 49 Ohio St. 137, 177 ; 15 Law Rep. Ann. 145.)

The further contention is made by appellant that this action being

prosecuted on behalf of the German-American Bank, the legal owner of the bonds, the further question for determination is, whether the bank has acquired the title of a *bona fide* purchaser, though the trust company may not have stood in that position.

We do not regard the question of the good faith of the holders of these bonds of any account so long as it appears that they took them for value and paid for them in cash. The bonds in question were issued with the consent of all the stockholders at the time they were issued ; therefore, neither the stockholders nor the corporation are in a position to contest their validity. This doctrine is held in *Kent* v. *Quicksilver Mining Co.* (78 N. Y. 159) and in *Skinner* v. *Smith* (134 id. 240) in respect to manufacturing corporations — corporations which do not possess the right of eminent domain; which have no duty to perform to the public. The corporation in this case is one of that kind. There is no evidence that the issue of these $10,000 of bonds would impair the power of this company to discharge its duty to the public. There is no member of the public who makes any objection, or seeks to have these bonds set aside, and no stockholder or creditor seeks to have them set aside, and, as against everybody else, the plaintiff has the absolute right to recover.

Further discussion of the questions presented here is unnecessary, as it appears to us that the decisions bearing upon these questions clearly sustain the right to enforce the payment of the bonds in question.

In accordance with the decision in *Williamsburgh Savings Bank* v. *Town of Solon* (136 N. Y. 465) the allowance of interest upon the coupons must be deducted. The amount of interest so allowed is the sum of $1,293.04.

The judgment should be modified by deducting from the amount thereof the sum of $1,293.04, and as so modified the judgment should be affirmed, without costs in this court to either party.

All concurred.

Judgment modified by deducting from the amount thereof the sum of $1,293.04 as of the date of the report of the referee herein, and as so modified affirmed, without costs of this appeal to either party.