Kaplan et al. v. Bagrier et al.

*H. Arronson,* for plaintiffs; *H. B. Borneman,* for defendants.

KUN, J., Oct. 4, 1929.—The plaintiffs, in pursuance of the provisions of section 9 of the Arbitration Act of 1927, P. L. 381, have moved to confirm an award made in their favor.

The plaintiffs, the Hebrew Master Bakers Association of Philadelphia, constitute a voluntary unincorporated association composed of thirty-two members who are engaged in the business of manufacturing bakery products in the City of Philadelphia. For the sake of brevity, the plaintiffs will hereinafter be referred to as the "Association."

The defendants, the Bakers' Union Local No. 201, constitute a voluntary unincorporated association, having a charter from the Bakery and Confectionery Workers' International Union of America, composed of various employees engaged in the baking industry in the City of Philadelphia. The defendants will hereinafter be referred to as the "Union."

The Consumers Baking Company is a corporation organized under the laws of the State of Pennsylvania, and has been since 1921 engaged in the business of manufacturing bakery products at No. 1117 South Randolph Street, in the City of Philadelphia. The Consumers Baking Company will hereinafter be referred to as "Consumers."

The Consumers is a co-operative bakery owned, managed and controlled by the defendants.

On May 1, 1928, in the City of Philadelphia, the Association and the Union entered into a written collective bargaining agreement, a full copy of which appears as Exhibit A attached to the petition to confirm the award filed in this case. The avowed purpose of the agreement was to have the Union furnish to members of the Association union employees and defining at the same time wages and working conditions and the nature of the work to be performed by the employees, members of the Union. The agreement furthermore provided in Article XI thereof, under the heading "Duties of the Board of Adjustments under the Collective Bargaining in this Agreement," as follows: "There shall be formed under this Agreement a permanent Board of Adjustment, such Board to consist of eleven members; five representatives of the Union, five representatives of the Association, and Adolph Rosenblum, to act as Impartial Chairman, with the power to render final decisions. Such Board shall function and act from the period commencing May 1, 1928, until April 30, 1929.

"It is further and mutually agreed that the questions, matters, complaints which shall be presented to the Board of Adjustments for decision shall be as follows:

"(a) Alleged violations of this agreement.

"(b) The determination of the true intent and meaning of any part of this agreement.

"(c) The adjustment of any and all grievances between the Union and members of the Association, between the Union and the Association, and members of the Union and members of the Association.

"(d) To finally settle and adjudicate all appeals that should be taken by any party who feels himself aggrieved by the decision of the Executive Board of the Union, or by any decision of the Association, provided, however, said decision affects the Association or any member of the Association."

At the same time when the agreement was signed by the Union and by every member of the Association, a collateral agreement was executed by the Union and by the Association which provides in a general way that the collective bargaining agreement signed by the Union and by each of the constituent members of the Association shall remain in the possession of Adolph

Rosenblum, the Impartial Chairman, until such time as the arbitration board, consisting of Isaac Dornblum, representing the Association, and Morris Poulin, representing the Union, will render its decision with reference to the complaint of the constituent members of the Association and of the Association concerning the activities of the Union in the conduct and operation of the Consumers. The agreement further provided that if the board composed of Isaac Dornblum and Morris Poulin failed to arrive at a satisfactory understanding, an arbitrator was to be selected, whose decision was to be binding upon the Association, its constituent members, the Union and the Consumers.

The collateral agreement also provided: "It is further agreed and understood that the Bakery & Confectionery Workers Local No. 201 assumes full responsibility for the Consumers Baking Company in this agreement."

Messrs. Dornblum and Poulin held a number of meetings; they were unable to arrive at a satisfactory disposition of the controversy, and thereupon they called in Dr. Jacob Billikopf, who agreed to act as arbitrator, after having been assured by the Union and by the Association that the decision that would be rendered by him would be lived up to by the Association and by the Union in act and in spirit.

Doctor Billikopf made his decision on July 23, 1928, and in a general way he decided that it was impractical and undesirable for the Union to conduct the Consumers as an enterprise competing against the members of the Association, all of whom employ Union help. He ordered that the Consumers discontinue the baking of rye bread by Dec. 31, 1928, and that a committee be forthwith appointed, composed of members of the Association and of the Union, to facilitate the execution of his decision.

Shortly after the decision was rendered by Doctor Billikopf, the Association called upon the Union to appoint their representatives upon the committee referred to by Doctor Billikopf in his report. At a meeting called, which was attended by representatives of the Association and representatives of the Union, the Union expressed its unwillingness to discontinue the baking of rye bread, and submitted an alternative proposition that the Union would sell out all its interest in the Consumers, and that the Consumers would cease the baking and distribution of any food products on and after Dec. 31, 1928. The Association accepted the suggestion made by the Union.

It appears that no active steps were taken by the Union to dispose of the plant owned by the Consumers, and thereupon a complaint or grievance was filed by the Association against the Union with the Board of Adjustments provided for in Article XI of the collective bargaining agreement described above. The complaint of the Association was:

(a) That the agreement of May 1, 1928, between the Union and the Association was violated, in that the Union, acting through the Consumers, did not carry out, nor were they taking any steps to carry out, the decision of Dr. Jacob Billikopf, which was rendered on July 23, 1928.

(b) That to permit the Union, acting through the Consumers, to carry on a business competitive with the members of the Association was in violation of the true intent and meaning of the agreement of May 1, 1928.

(c) That certain practices had been indulged in by members and officers of the Union, acting through the Consumers, which were inimicable to the best interests of employer and employee.

A meeting of the Board of Adjustments took place on Nov. 19, 1928, at 3 o'clock P. M., at No. 509 South 5th Street, Philadelphia, at which time and place the various matters pertaining to the grievances aforesaid were taken

up and considered. The meeting was adjourned to Nov. 26, 1928, at 3.30 P. M., and thereafter the meeting was again adjourned to Dec. 29, 1928, at No. 509 South 5th Street, Philadelphia, at which time and place the complaints of the Association against the Union were again discussed and debated.

At each of these three meetings representatives of the Association and representatives of the Union, authorized to act on behalf of their respective members, were present and testimony was orally heard with reference to the grievances presented. Thereafter, the Board of Adjustments having heard all that could be said one way or the other pertaining to the grievances submitted by the Association to the Board of Adjustments for disposition, the Board of Adjustments did, on Jan. 16, 1929, hand down its findings and award, under the hands and seals of a majority of the Board of Adjustments, a copy of which, marked Exhibit B, is attached to the petition filed by the Association for the confirmation of the award.

Immediately thereafter, on Jan. 16, 1929, Adolph Rosenblum, the Impartial Chairman of the Board of Adjustments, delivered a copy of said written findings and award to each one of the parties to the contention.

The conclusions of the Board of Adjustments provided:

*(a)* That immediate *bona fide* efforts should be made and proper steps be taken by the Union, the owners and proprietors of the Consumers, to make an immediate sale and disposition of the assets of the Consumers.

*(b)* That on and after April 1, 1929, the Union, operating the Consumers by its servants, agents and employees, should not manufacture, sell or distribute any bakery products; and

*(c)* The Union should pay to the Association damages in the sum of $250 per day for each and every day or fraction thereof that the Consumers shall manufacture, sell or distribute bakery products on or after April 1, 1929, or on or after April 15, 1929, should an extension be granted by the Impartial Chairman under the conditions mentioned in the conclusions and order.

The "Conclusions and Order" of the decision of the Board of Adjustments furthermore provided: "Should any provision of this award be found contrary to law, such finding shall in no way affect the other provisions of this award and decision, which shall, notwithstanding, continue in full force and effect."

The Association, in April, 1929, applied to this court for an order confirming the award of the Board of Adjustments, under the provisions of section 9 of the Act of April 25, 1927, P. L. 381 (1928, West Publishing Company, Pennsylvania Statutes, Cumulative Supplement, page 72).

The Union filed an answer to the motion made for the confirmation of the award, admitting substantially all of the facts set forth in the petition for the confirmation of the award, but raising certain objections, which will be discussed during the course of this opinion.

Arbitration is intended to be a short cut to substantial justice between parties. In earlier times, the courts were disposed to look with disfavor on arbitration and to give it as little force as possible, but later, more intelligent judicial sentiment has construed it favorably. The mode of settling controversies by arbitration has in modern times become peculiarly the favorite of the law, and the ancient niceties and technicalities applied to it have given way to a more rational and liberal construction, with a view to encourage and sustain this mode of preventing or putting an end to litigation. The practice of settlement of disputes by arbitration is encouraged by the courts. As was said in Horne *v.* Welsh, 35 Pa. Superior Ct. 569: "Submissions of disputes to arbitrators are favored by the law, and approved by the enlightened senti-

ment of the world at large." The policy in Pennsylvania, it was said in one case, has been to encourage arbitration, and the courts have inclined to construe liberally the acts of assembly relating to it: Bingham's Trustees *v.* Guthrie, 19 Pa. 418.

This favorably attitude found expression in the Act of April 25, 1927, P. L. 381, by which a simple method of procedure relating to arbitration was adopted by the legislature.

Section 1 of the Act provides: "A provision in any written contract, except a contract for personal services, to settle by arbitration a controversy thereafter arising out of such contract or out of the refusal to perform the whole or any part thereof, or an agreement in writing between two or more parties to submit to arbitration any controversy existing at the time of the agreement to submit, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."

Section 9 provides that "At any time within one year after the award is made any party to the arbitration may apply to the court having jurisdiction for an order confirming the award, and thereupon the court shall grant such an order, unless the award is vacated, modified or corrected as prescribed in the next two sections."

Section 10 provides that the court shall make an order vacating the award upon the application of either party:

*(a)* Where the award was procured by corruption, fraud, or undue means.

*(b)* Where there was evident partiality or corruption on the part of the arbitrators, or any of them.

*(c)* Where the arbitrators were guilty of misconduct in refusing to postpone the hearing upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy, or any other misbehavior by which the rights of any party have been prejudiced.

*(d)* Where the arbitrators exceeded their powers or so imperfectly executed them that a final and definite award upon the subject-matter submitted was not made.

Section 11 relates to modification and correction of awards, under certain stated circumstances and conditions.

It is contended by counsel for the Union that the contract of May 1, 1928, between the Association and the Union relates to personal services, and, under the circumstances, the provisions of the Arbitration Act of 1927, above referred to, do not apply to the matter in controversy.

The matter in controversy between the Association and the Union arises, however, out of the provisions of an instrument between an association of employers and a labor union, and the contract which is before the court is what is commonly known as a Collective Bargaining Agreement.

The term "collective bargaining" is used to denote the negotiation of terms and conditions of employment between an organization acting on behalf of employees and an employer, or association of employers, in contradistinction to bargaining between an employer and an individual employee: Oakes, Organized Labor and Industrial Conflicts, § 201, page 220.

It is impossible to frame a definition of the words "personal service" in phraseology which would be so comprehensive as to embrace all the various shades of meaning which it bears in judicial language and in statutory provisions. The essential and characteristic element of a contract of personal service as contrasted with a collective bargaining agreement is, however, sufficiently marked to enable a proper interpretation of the term in our statute. Where one person is employed to do certain work for another, who,

under the express or implied terms of the agreement between them, is to have the right of exercising control over the performance of the work to the extent of prescribing the manner in which it shall be executed, the employer is the master, and the work to be performed constitutes personal services: Morgan *v.* Bowman, 22 Mo. 538; Eversley on Domestic Relations, 859; 1 Labatt Master and Servant (2nd ed.), 19. It is to be presumed that the descriptive term "personal service" was used in section 1 of the Arbitration Act in its ordinary and commonly accepted meaning as applicable to a situation where one performs personal services; that is to say, having reference to a servant or employee who voluntarily agrees to subject himself at all times during the period of service to the control, orders and directions of another, his employer, with reference to certain services to be performed. There is no personal service element in the contract of May 1, 1928, in so far as the rights and obligations of two groups, the Union and the Association, are concerned. The contract is not confined to the usual relationships between master and servant, but has a much wider and broader scope, being a collective bargaining agreement intended to fix certain rights and obligations between the two groups mentioned, one the group of employers and the other the group of employees, for their mutual interests. It is not a direct personal service contract within the contemplation of the exception in the act.

The matter in controversy is not at all concerned about any question of personal service, but arose out of the question whether the Union's action as a group in conducting an enterprise through a corporation in competition with their employers was subversive of their mutual interests.

Contracts between employers and a labor union must be given a reasonable construction so as to maintain their entire validity, if possible: Nederlandsch *v.* Stevedores, 265 Fed. Repr. 397 (1920). See, also, Birdseye on Arbitration and Business Ethics, page 128, and Curran *v.* Philadelphia, 264 Pa. 111, at page 120.

There is no merit in the contention of the Union that the award of the Board of Adjustments decides an issue which was not submitted. The pleadings in the case indicate the nature and character of the complaint. The details thereof are stated in the earlier portion of this opinion. The issue that was to be decided by the arbitrators related to the activities of the Union, in that it conducted and operated a competitive co-operative bakery. The submission was oral. Both parties participated in the arbitration proceedings. The Union, therefore, is estopped to raise any question as to the propriety of the submission: 5 Corpus Juris, § 14, page 22; Lobb *v.* Lobb, 26 Pa. 327.

It is within the jurisdiction of the court to determine whether this is such a controversy as the parties have agreed to arbitrate; and where the question is technically close, the court will give effect to the agreement in a more liberal sense, as tending to accomplish a final settlement of the existing controversy.

The Union proceeded to introduce evidence at, and did proceed with, the three arbitration hearings discussed in the award of the arbitrators. It is clear to the court that the Union should not be permitted to upset the award on the alleged ground that the arbitrators awarded on a matter not submitted. See Priore *v.* Schermerhorn, 237 N. Y. 16 (1923); 142 N. E. Repr. 337.

Paragraph 13 of the petition for the confirmation of the award clearly and distinctly avers that a complaint was filed. The nature and character of the complaint is set forth in the award of the arbitrators. Notice was served,

meetings were held, participated in by both sides, and testimony was taken. There is no allegation in the answer filed by the Union that the question which was submitted to arbitration was the one which the arbitrators did not determine or decide.

Paragraphs 11 and 15 of the findings of the Arbitration Board clearly state the contentions of both parties. The Association contended that the Consumers should be closed down on Jan. 1, 1929, in accordance with the agreement made by the Union, which owned and operated the Consumers. The Union sought an extension for a period of six months from Jan. 1, 1929. This was objected to by the representatives of the Association. The issue which was decided by the arbitrators related to the activities of the Union in conducting the operation of the Consumers. The award of Jan. 16, 1929, was the result of the submission. The award did not go beyond the submission in any respect, neither did it undertake to decide matters which were not referred to the arbitrators. The arbitrators decided the things submitted to them and nothing more. See Practice of Commercial Arbitration, page 60. Although an agreement to arbitrate may not be binding, yet if the parties submit the controversy to arbitration, the award is binding unless affected by fraud, partiality or other improper conduct of the arbitrators: Sloan v. Standard Chemical Co., 256 Fed. Repr. 451; 167 C. C. A. 579. And it was also held that an award made pursuant to a submission to arbitration of a dispute will be binding whether the matter submitted did or did not afford a legal cause of action: Saengerbund v. Dunn, 41 Tex. Civ. App. 376, 92 S. W. Repr. 429.

There is no provision in the Arbitration Act authorizing the court to vacate an award because it is against the weight of the evidence or because, perchance, there is no evidence to support it. An arbitration, while it partakes of the nature of a quasi-judicial proceeding, is not such a proceeding in the technical sense. The disputants select their own judges. The object of the arbitration is to arrive at a determination of the matter in dispute and finally dispose of the same in a speedy and inexpensive way. Where the evidence is close, the arbitrators are the sole judges of its weight and what decision should be made. If their decision is against the weight of the evidence or if there is no evidence to support it, it may still be found upon the principles of equity and good conscience and the court is powerless to review the action of the arbitrators on a motion to confirm the award. See Everett v. Brown, 120 N. Y. Misc. 349 (1923); Starr v. McNeal, 253 Pa. 98, particularly the opinion of Barratt, P. J., and Itoh v. Boyer, 198 App. Div. 881 (1921), 191 N. Y. Supp. 292, where Smith, J., said: "The courts have uniformly held that any finding of fact or conclusion of law of an arbitrator will not be reversed. . . . The merits of award, however unreasonable or unjust it may be, cannot be reinvestigated, or otherwise the award, instead of being the end of the litigation, would simply be a useless step in its progress. . . . Code sections state the grounds on which an arbitration award may be vacated or modified; vacated for fraud, partiality, misconduct or exceeding powers; modified for evident miscalculation of figures, mistake of person or matter, or imperfection of form."

Then, too, the courts will not allow a party to speculate on the results of the arbitration. If he has grounds or desires to repudiate his submission, he is bound to do so before the result is known and he has been defeated: Hewitt v. Lehigh & H. River R. Co., 57 N. J. Eq. 511, 42 Atl. 325. A party who goes to trial before arbitrators and takes his chances of a favorable award is conclusively bound by an award against him: Bingham v. Guthrie, 19 Pa. 418.

The Union also contended that the award is not binding on the Consumers, which did not execute the agreement of May 1, 1928. It is clear from the find-

ings in the award of the arbitrators that the Union is an unincorporated association; that the Consumers is a Pennsylvania corporation, and that the Consumers is owned, managed and controlled by the Union. In other words, we have one group of persons operating as two separate entities; first, as an unincorporated association; and, second, the same group operating as a corporation known as the Consumers. As hereinbefore noted, the collateral agreement between the parties provided that the Union "assumes full responsibility for the Consumers Baking Co. in this agreement." If the award be carefully examined, it will be seen that it was directed against the Union, which owns, controls and operates the Consumers.

The effect of the award is to bring pressure to bear on members of the Union which will ultimately affect the operations of the Consumers.

The fiction that the corporate existence and corporate functions are distinct from that of stockholders . . . is introduced for convenience and to subserve the ends of justice; but when invoked in support of an end subversive of its policy should be and is disregarded by the courts: Southern Electric Securities Co. v. State, 91 Miss. 195 (1907), 124 Am. St. Reps. 638, 44 So. Repr. 785, 1 A. L. R. 610.

It is said by Morawetz, in his book "Private Corporations," § 227: "The statement that a corporation is an artificial person or entity, apart from its members, is merely a description in figurative language of a corporation viewed as a collective body; a corporation is really an association of persons, and no judicial *dictum* or legislative enactment can alter this fact." See Buffalo Loan, Trust & S. D. Co. v. Medina Gas & E. L. Co., 12 App. Div. 199 (1896), 42 N. Y. Supp. 781. Also, Kendall v. Klapperthal Co., 202 Pa. 596 (1902), in which it is said: "But it is well understood that for purposes of equity courts will look behind that artificial personality and, if need be, ignore it altogether and deal with the individuals who constitute the corporation (Rice's Appeal, 79 Pa. 168; Montgomery Web Co. v. Dienelt, 133 Pa. 585; Pennsylvania Knitting Mills v. Bibb Mfg. Co., 12 Pa. Superior Ct. 346; Gas Co. v. West, 50 Ia. 16)." See, also, 14 Corpus Juris, 59, and 7 Ruling Case Law, § 4, page 27.

The stockholders of a corporation are distinct from the corporation itself, but an injunction against their doing a specified act is violated if they cause or aid the corporation to do that act: King v. Barnes, 113 N. Y. 476 (3 Cook on Corp., §§ 663, 664). See, also, Elliott on Private Corp., § 10, page 14.

It follows, therefore, that the award is not defective because directed against certain acts or certain conduct on the part of the individuals constituting the Union, who, at the same time, operated the Consumers and for which it specifically assumed full responsibility. The award would be effective to prevent their use of a corporate entity for the purpose and to the end of destroying the effect and intent of a proper award.

Section 4 of the conclusions and order of the award of the arbitrators is as follows: "The Union shall pay to the Association damages in the sum of Two Hundred and Fifty Dollars per day for each and every day or fraction thereof that the Consumers Baking Company, acting through its servants, agents, officers, stockholders and employees, shall manufacture, sell and distribute bakery products on and after the 1st day of April, 1929, or after April 15, 1929, should an extension be granted by the impartial Chairman under the circumstances mentioned in the third finding hereof."

The Union contends that the arbitrators exceeded their power and authority in making the award against the Union for damages should the Union violate the order and award of the arbitrators. Counsel for the Association has with

a great deal of force and earnestness argued to the contrary and has called our attention to a number of cases and authorities which upon their surface may lend color and weight to this contention.

The court, however, after a careful study of the cases and argument of counsel, has concluded that the clauses in the collective bargaining agreement relating to arbitration did not authorize the "Board of Adjustments" to make an award before any damages had in fact been sustained. By section 4 of the conclusions and award of the Board of Adjustments, above quoted, the arbitrators made an award, not for damages which the Association had sustained, but for those which the arbitrators supposed the Association would sustain in the event the Union would not carry out its award. Such an award is premature and void. See Allen v. Galpin, 9 Barb. (N. Y.) 246; 5 Corpus Juris, § 323, page 134.

Originally, it seems, an award which was bad in part was considered altobether bad. But from an early day it has been the general rule that an award which is good in part and bad in part will be sustained as to that which is good, if the two parts are severable—if the void part is not necessary to the finality of the award under the submission, or if it be not the consideration of the thing awarded to be done on the other side: 5 Corpus Juris, 156; Wynn v. Bellas, 34 Pa. 160; Babb v. Stromberg, 14 Pa. 397; Richter v. Chamberlin, 6 Binn. 34. See 2 Ruling Case Law, § 39, page 397.

Whether the decision of the arbitrators whom the parties chose as their tribunal was or was not economically sound is a matter with which the court is not concerned. It is to be noted that the provisions of the Arbitration Act relating to the confirmation of an award leave no discretion to the court. It prescribes (section 9) that the court shall confirm the award, unless such award has been vacated, modified or corrected: Everett v. Brown, 120 N. Y. Misc. 349; 198 N. Y. Supp. 462.

As was well said by Judge Andrews in Kelley et al., 240 N. Y. 74, 147 N. E. Repr. 363 (1925): "As to the merits between the parties, neither we nor the courts below are concerned. That is solely for the arbitrators to determine, if arbitration there should be."

The court, therefore, enters the following order:

That section 4 of the conclusions and orders of the arbitrators is stricken out; and, with this modification, the rule to show cause why the award should not be affirmed is made absolute, and judgment is now entered in favor of the plaintiff against the defendants.