AMERICAN EXCH. NAT. BANK OF NEW YORK v. FIRST NAT. BANK OF SPOKANE FALLS et al.

Circuit Court of Appeals, Ninth Circuit. October 4, 1897.

No. 336.

1. NOTICE TO TAKE DEPOSITIONS—REASONABLENESS AS TO TIME.
    What constitutes a reasonable notice, in point of time, of the taking of depositions, under Rev. St. §§ 863-865, depends upon the circumstances of each particular case; the chief circumstances to be considered being distance, number of witnesses, and facility of communication to obtain proper representation at the taking.

2. DEPOSITIONS—NOTARY'S CERTIFICATE.
    A statement in the certificate of a notary taking a deposition that he is "not of counsel nor interested in any manner whatever in this cause" is a substantial compliance with the requirement of Rev. St. § 863.

3. BANKS AND BANKING—COVERT BORROWING BY BANK.
    If, for the purpose of enabling a bank to borrow without having its printed statements show it as a borrower, another bank credits a sum to the borrower's account, and charges the same to a special account, and takes an individual guaranty note from the borrower's directors, amounts drawn on the credit constitute a loan to the bank, and not to its directors.

4. SAME—TRIAL—QUESTION FOR JURY.
    Upon the question whether a loan was made to the defendant bank itself, and secured by a guaranty note of its directors individually, or was made to the directors upon their own note, there was conflicting testimony as to the original agreement, but it appeared that interest was charged to the bank, and by it entered on its books under profit and loss; that the note itself was a promise to repay loans made to the bank; that the bank's cashier, in transmitting the note, referred to it as a guaranty; and that the loan was credited to the bank, and drawn on by it in the ordinary method and course. *Held*, that there was sufficient evidence of a loan to the bank to warrant a submission to the jury.

5. SAME—BORROWING IN DIRECTORS' NAMES.
    On the question whether a loan was made to a bank or to its directors, the private arrangements of the directors as to how the transaction should

82 F.—61

be entered on the bank's books would not be controlling as against the lender.

**6. CORPORATIONS—CONTRACTS BY UNAUTHORIZED AGENT—RATIFICATION.**

A corporation may become liable upon contracts assumed to have been made in its behalf by an unauthorized agent, by appropriating and retaining, with knowledge of the facts, the benefits of the contract.

**7. SAME—EVIDENCE.**

The fact that the directors of a bank unite in making a guaranty note to secure a loan to the bank previously arranged for by the cashier is evidence of ratification of the cashier's act.

**8. BANKS—NOTICE OF DIRECTORS' MEETINGS.**

If the directors of a bank have long pursued an established custom of holding meetings and transacting business at the bank during business hours whenever a sufficient number were present, the custom would carry with it a standing notice to each director, and enable those present to proceed, in the absence of a controlling by-law or statute.

In Error to the Circuit Court of the United States for the Eastern Division of the District of Washington.

The writ of error in this case was sued out by the First National Bank of Spokane Falls and F. Lewis Clark, receiver of said bank, defendants in the court below, for certain errors claimed to have been committed by the trial court in admitting and rejecting evidence, in giving and refusing to give instructions to the jury, and in denying a motion for a verdict in favor of the defendants (plaintiffs in error), in the sum of $16,021.70, with interest, etc. The action was brought by the American Exchange National Bank of New York to recover the sum of $34,472.20, with interest thereon from the 5th day of August, 1893, at the rate of 8 per cent. per annum, and interest on the sum of $50,000, at the rate of 6 per cent. per annum from the 1st day of May, 1893, to the 5th day of August, 1893. The complaint alleges, substantially, that on or about the 9th day of November, 1892, the defendant the First National Bank of Spokane Falls, by and through its cashier and board of directors, borrowed of the plaintiff, the American Exchange National Bank of New York, and the latter, through its duly authorized officers, loaned to said defendant bank, the sum of $50,000, which sum was then and there, by and with the authority and consent of the cashier and board of directors of the defendant bank, placed to the credit of defendant bank on the books of the plaintiff bank, and was afterwards, but prior to the 26th day of July, 1893, drawn upon by the defendant bank, and fully paid out by the plaintiff bank upon the checks and drafts of defendant bank, in the due and ordinary course of business between the two banks, the plaintiff bank, during all the times and periods mentioned, being the defendant bank's correspondent in the city of New York; that it was agreed that said loan should bear interest at the rate of 1½ per cent. per annum until said rate should be changed by mutual agreement; that afterwards, on the 7th day of March, 1893, it was mutually agreed between said banks that the rate of interest upon said loan should be changed from 1½ per cent. per annum to 6 per cent. per annum; that on the 26th day of July, 1893, the defendant bank became and was insolvent, closed its doors, and shortly thereafter went into the hands of a receiver for liquidation, defendant F. Lewis Clark being appointed by the comptroller of the currency as such receiver; that for a long time prior to the making of said loan of $50,000, as aforesaid, the plaintiff bank was, and continued to be up to the date when the defendant bank closed its doors, the regular correspondent of the latter bank in the city of New York, and during all of said period there was a large and varied account between the two banks, upon which the defendant bank received the credit of said $50,000; that at the time the defendant bank closed its doors, as aforesaid, there appeared to be a balance of $15,527.80 on the said account in favor of the defendant bank, which amount the plaintiff bank then and there credited upon said loan of $50,000; that but for said credit of $50,000, so entered upon said account, as aforesaid, in favor of the defendant bank, on account of said loan, there would have been an overdraft of $34,472.20 against the defendant bank at the time

it closed its doors, instead of an apparent balance in its favor. The answer contained a general denial as to the fact of the alleged loan to the defendant bank, and set up, as a further and separate defense and counterclaim, that on the date of the suspension of the defendant bank, which was the 26th of July, 1893, the plaintiff bank had in its hands, belonging to the defendant bank, funds, moneys, and credits amounting to the sum of $16,383.49, for which sum, with interest thereon at 8 per cent. per annum from the 26th day of July, 1893, judgment was prayed. Both sides introduced evidence, and, after trial duly had, the jury returned a verdict for the plaintiff bank, the defendant in error here, for the sum of $34,713.71, with interest on the same from May 4, 1893, to April 30, 1896, amounting to $6,225.35, and aggregating a total of $40,939.06, for which sum judgment was entered in favor of the plaintiff bank.

C. S. Voorhees (Jones, Voorhees & Stephens, of counsel), for plaintiffs in error.

Blake & Post, for defendant in error.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

MORROW, Circuit Judge, after stating the case as above, delivered the opinion of the court, as follows:

The assignment of errors contains some 59 specifications, but the principal one to be considered by this court, the determination of which will go far in disposing of many of the remaining ones, is the 1st, to wit:

"That the court erred in giving any instructions whatever to the jury, except an instruction to find a verdict for defendants for the sum of $16,021.70, for the reasons that there was no evidence whatever in said cause tending to show any right of the plaintiff to a verdict in said cause against said defendants or either of them, and that the evidence in said cause required the jury to find a verdict for defendants for the sum of $16,021.70, together with interest thereon at the legal rate."

This assignment of error raises the question whether there was any evidence tending to show that the plaintiff was entitled to the verdict. However, preliminarily, and before considering this assignment of error, two other assignments of error (Nos. 35 and 36), relating to the admission in evidence of two depositions, may with propriety be disposed of. It is contended, under these two assignments, that the notice given of the taking of the depositions of Edward Burns and Dumont Clarke, two witnesses on behalf of the plaintiff bank, was not reasonable in point of time, and that the certificate of the notary public was fatally defective, in that it failed to certify that such notary was not, at the time of the taking of such depositions, of counsel or attorney to either party, and was not interested in the event of the cause. The evidence of these two witnesses was of great importance to the plaintiff bank, and its suppression would have withdrawn from the consideration of the jury evidence without which it is difficult to see how they could have found a verdict in favor of the plaintiff bank. With respect to the reasonableness of the time, notice was given by the attorneys for the plaintiff bank at Spokane to the attorneys for the defendant bank and the receiver, on February 29, 1896, that the testimony of Edward Burns and Dumont Clarke, residents of the city of New York, would be taken, under the provisions of sections 863, 864, and 865 of the Revised Stat-

utes, before Carlton J. Barnes, a notary public in and for the city and county of New York, at the law offices of Cardozo & Nathan, No. 120 Broadway, in the city and state of New York, on the 10th day of March, 1896, at 10 a. m., and thereafter from day to day, as the taking of the depositions might be adjourned. This notice was duly received and acknowledged by the attorneys for the defendant bank on February 29, 1896. It gave them 10 days within which to communicate with their representatives in New York, and to prepare for the taking of the depositions. While this notice was short, it cannot be said, under the circumstances, to have been so unreasonable, without any showing on the part of the defendant bank that bona fide efforts were made by them to be represented at the taking of the depositions, as would justify the trial court in suppressing the depositions. It is true that the defendant bank was deprived of the cross-examination of these two witnesses, but this could have been avoided had there been all due diligence and alacrity in the matter. No effort, so far as the records show, appears to have been made to secure a postponement of the examinations. Five or six days, at the most, under ordinary circumstances, would have sufficed to write to New York and communicate with attorneys there to be represented at the examination. This would still have left four or five days in which to prepare for the taking of the depositions. As a matter of fact, the taking of the depositions did not begin on the 10th of March, 1896, but it was continued to the next day, the 11th of M⸺h. The question of reasonableness of notice depends, obviously, upon the circumstances of each particular case. It is a relative question. 'What may be reasonable in one instance may not in another. The chief features to be considered in determining whether a certain notice is or is not reasonable are distance, number of witnesses, and facility of communication and to obtain proper representation. Considering all of these elements with reference to the taking of depositions in a place like New York City, and particularly with respect to the circumstances of this case, we think that the notice was reasonable.

With respect to the claim that the certificate of the notary public is fatally defective in the particular above indicated, it is enough to say that the certificate, as it appears in the printed transcript of record, contains the following statement: "That I am not of counsel nor interested in any manner whatever in this cause." This would seem to comply substantially with the provisions of section 863 of the Revised Statutes. Donahue v. Roberts, 19 Fed. 863; Coal Co. v. Maxwell, 20 Fed. 187; Stewart v. Townsend, 41 Fed. 121; 1 Fost. Fed. Prac. (2d Ed.) p. 512, § 286. The action of the lower court in denying the motion to suppress the depositions, and in admitting them in evidence, was, we think, correct and proper.

Reverting to the 1st assignment of error, it is hardly necessary to observe that the function of this court, in reviewing a case upon a writ of error, is not to try the case de novo, but simply to ascertain whether there was sufficient evidence to go to the jury. Pleasants v. Fant, 22 Wall. 116, 122; Commissioners v. Clark, 94 U. S. 278, 284; Elliott v. Railway Co., 150 U. S. 245, 246, 14 Sup. Ct. 85;

Railroad Co. v. Johnson's Adm'x, 44 U. S. App. 1, 16 C. C. A. 317, and 69 Fed. 559, and cases there cited.

There is no question as to the fact that the plaintiff bank, the American Exchange National Bank of New York, advanced the sum of $50,000. It is contended by the plaintiff bank that the evidence shows that this sum was advanced or placed to the credit of the First National Bank of Spokane Falls; while it is claimed on the other hand, by the defendant bank and F. Lewis Clark, its receiver, that the evidence tends to show that the money was advanced to the directors of the bank upon their individual responsibility. The jury, by their verdict, necessarily adopted the view that the money had been advanced to and drawn by the defendant bank, and not by the directors individually. Were they justified in so finding, and were the rulings and instructions of the court in this respect correct? It appears from the evidence that the plaintiff and defendant banks were at the time of the loan, and had been for some time previous, corresponding banks; that from the fall of 1890 to 1892 the defendant bank had had some three or four runs which had embarrassed it very much, almost compelling it to close its doors on two or three occasions; that in the fall of 1891 Mr. Horace L. Cutter, the cashier and one of the directors of the bank, had occasion to take a trip East; that, before going, he talked with several of the other directors about the advisability of making arrangements with some of the bank's Eastern correspondents to allow the bank, in case of an emergency, an overdraft all the way from $25,000 to $100,000; that while no express and specific authorization to incur a loan for the bank appears to have been given by the board of directors to Cutter, as its cashier and one of the directors, nevertheless, in pursuance of the conversation had as stated, Cutter, while in New York City, called at the place of business of the American Exchange National Bank of New York, and had an interview with its vice president, Mr. Dumont Clarke, and its cashier, Mr. Edward Burns, relative to a loan or advance of $50,000 or $100,000 should his bank need such a sum. The testimony of Cutter, who was called as a witness for the defendant bank, as to the arrangements he effected to secure the loan, is briefly as follows:

"Q. Did you have any conversation with the said Clarke and Burns in the city of New York, in the fall of 1891, relative to the loan of fifty or one hundred thousand dollars? A. I did. Q. Now, you may state, Mr. Cutter, in detail, as fully as you can, such conversation. A. In the fall of 1891—I think it was in the fall of 1891—I was in New York City, and called at the American Exchange National Bank, and had an interview with Mr. Clarke, the vice president of the bank, and Mr. Burns, the cashier, relative to a loan of fifty or a hundred thousand dollars. I said at the time that I did not desire to use the credit of the bank, but that certain of our directors, who owned the majority or most of the stock of the bank, would give their individual liability therefor. Upon my going there the following day, they told me that we could have it. It was then arranged that the fifty thousand dollars or the loan we might take would be placed to the credit of the First National Bank of Spokane on special account by the giving of this individual liability of the directors. * * * Q. You may state what was said in the conversation on the second day to which you have alluded, in connection with the credit upon which this loan was made. A. It was simply to be placed to the credit of the First National Bank of Spo-

kane on special account, on the individual liability of the members constituting the board of directors."

Edward Burns, cashier of the American Exchange National Bank of New York, called for the plaintiff bank, testified:

"Q. Will you please state fully the conversation that you had with Mr. Cutter in October, 1891? A. Mr. Cutter and the president and myself talked for some time in regard to the matter of loaning him fifty or one hundred thousand dollars. The principal part of the conversation related to the manner in which it would be loaned, and this was for the reason that Mr. Cutter stated that he was unwilling to let his printed statements go forth in his community showing him a borrower of money. He wished therefore the loan to be arranged in such a way as to avoid making this statement. We showed him how the loan could be made so that he could have a credit on our books, and yet not need to print on his statement the rediscounting of any of his bills receivable, the method which we told him of being as follows: We to charge the First Spokane special account, say, $50,000, and credit the First National Bank account (the general account) $50,000. This would give him the $50,000 to draw against on his regular account on his books. This would really show as against him, as an item due to banks. When I say 'this,' I mean the $50,000 would appear on his books as an item due to banks. Q. Give what Mr. Cutter said in the connection. A. Cutter was entirely satisfied with this plan, as it covered the very point he wanted to cover, as it afforded a plan to enable him to borrow without showing it as rediscounted paper on his statement. The plan which we proposed to Mr. Cutter was one which was used in many cases by banks which had the same object in view as that mentioned by Mr. Cutter; that is, the avoidance of printing bills rediscounted on the statements which they would be called upon from time to time to make by the comptroller. Q. State whether at that interview you did agree with Mr. Cutter to make any loan, and, if so, on what terms. A. We did agree to loan the First National Bank of Spokane $50,000 against the guaranty of his board of directors. The rate was made as low as one and one-half per cent., on account of an understanding that was had that the money was needed chiefly as a balance with us."

Mr. Dumont Clarke, vice president of the plaintiff bank, testified as a witness on its behalf, as follows:

"Q. Will you state fully the conversation then had with Mr. Cutter? A. The conversation was in relation to an accommodation which he desired or might desire. He wanted to place it in a shape that it would not appear upon any statement that he might render to the comptroller, as bills rediscounted for his bank. It was then suggested that we might make for him, as we did occasionally for some others, a special account; and, in case of his desiring accommodation, we could charge that special account, and credit his general account. In his statement it would then appear as due to banks. He was to give us as security, in case he needed such accommodation, a guaranty signed by his board of directors, or a major portion of them. Q. Did you have any talk with him as to a loan, or the amount of a loan, your bank should make when called upon? A. He wanted from fifty to one hundred thousand dollars. Q. What did Mr. Cutter say, if anything, in regard to this plan of borrowing money? A. The arrangement suited Mr. Cutter entirely."

In pursuance of this arrangement, the evidence tends to show that the sum of $50,000 was placed to the credit of the First National Bank of Spokane, and the monthly statements, designated as "Plaintiff's Exhibit 1" and "Plaintiff's Exhibit 5," and the vouchers accompanying the same, designated "Plaintiff's Exhibit 3," tend to establish the facts that on the 9th day of November, 1892, the defendant bank was given a credit of $50,000 on the books of the plaintiff bank, and that thereafter, between said 9th day of November, 1892, and the 26th day of July, 1893, inclusive, the latter being the date when the defendant

bank closed its doors, the account of the defendant bank with the plaintiff bank was drawn upon only in the usual and ordinary course of business between corresponding banks, and the moneys, funds, and credits on deposit with the plaintiff bank were paid out only upon drafts, checks, and orders signed by the duly authorized officers of the defendant bank issued to its customers in the usual and ordinary course of business. It appears, further, that the sum of $50,000 was not fully used up until the 14th of February, 1893, when it appears that the whole amount, and more, had been drawn out by the defendant bank in the regular course of business between the two banks. While this was the way in which the account stood between the two banks, the account on the books of the defendant bank appeared in this way: Prickett, one of the directors, was credited on his account with $50,000 on the 28th of January, 1892, that being the same day on which the note for $50,000 was executed to the plaintiff bank. On October 3, 1892, following, he was charged with $50,000, and the whole account was closed out so far as he was concerned, at that time. On December 15, 1892, the American Exchange National Bank special account of $50,000 was credited, on the books of the defendant bank, with $50,000, and the general account charged with $50,000, the effect of which was to close the special account, and carry the $50,000 into the open or general running account between the two banks. It was testified that Prickett held the $50,000 as trustee for the other signers of the note, and then advanced it to the bank, or rather used it in payment of $50,000 of the $150,000 increased capital stock. The capital stock was credited, on October 3, 1892, with $150,000. This amount, it was testified, was made up from $98,000 in paid-up dividends, to which the directors added certain small sums, aggregating $2,000 more, making $100,000; and this sum, with the $50,000 credited on the books to Prickett's account, went to make up the $150,000 increased capital stock.

It is a significant fact that through all these charges and credits, where it appeared that Prickett held the $50,000 as trustee for the directors who signed the note therefor, and then advanced it to the defendant bank in payment of $50,000 of the increased capital stock, the plaintiff bank did not know Prickett as trustee of this money. It had not advanced or agreed to advance the money to Prickett as trustee. On the contrary, its contention all through the trial was that the money had been placed to the credit of, and loaned to, the defendant bank, and not to the directors individually, and that the directors' note was simply a collateral security,—a "guaranty note." The evidence tends to show that it dealt with, and only with, the defendant bank in the regular course of business as a corresponding bank. The money was not drawn by Prickett as trustee or otherwise, but by the defendant bank in the regular course of business. The $50,000 was never in the possession or under the control of Prickett as trustee or otherwise; for, the first time credit was given by the plaintiff bank was on November 9, 1892, which was over a month after Prickett's account as trustee with his own bank had been closed out, on October 3, 1892. Moreover, this was some nine months after Prickett was first credited, on the books of the defendant, with the sum of $50,000 as trustee, viz.

January 28, 1892. As a matter of fact, Prickett and his associates still owe the $50,000 which it is claimed Prickett advanced in payment of increased capital stock. It is apparent, therefore, that, whatever private arrangements or understanding the directors of the defendant bank may have had among themselves with respect to how this advance or overdraft of $50,000 should appear upon their books, that could not affect the legal rights of the plaintiff bank to the defendant bank, providing the jury believed from the evidence that the plaintiff bank had loaned the defendant bank, and not the directors individually. If the jury believed that the plaintiff bank had simply placed to the credit of the defendant bank the sum of $50,000 should the latter need that sum or any part of it, and had 'secured a guaranty note from the directors of the bank as collateral·security therefor, and that such was the result of the arrangements entered into between Cutter, on behalf of the defendant bank, and of Clarke and Burns, on behalf of the plaintiff bank, it had the right to place such construction on the account of Prickett, as trustee, as it stood upon the books of the defendant bank, as was consistent with the view which it took that the money had been borrowed by the bank, and used by the bank, and not by the directors individually. There was evidence, further, tending to show that the plaintiff bank charged the defendant bank, and not the directors, with the interest on the loan. In this connection it is significant that on the books of the defendant bank, under date of May 4, 1893, there appears a charge to the profit and loss account of $735.49, as interest on the amount borrowed from the American Exchange National Bank. No attempt was made by the American Exchange National Bank to charge the directors with interest. No charge for interest was made against the directors on the books of the defendant bank. No exception was taken at that time, or at any subsequent time, until the trial, to the plaintiff bank charging the defendant bank, and not the directors individually, with the interest. It is true that at the trial, for the first time, the witness Cutter sought to explain this by stating that the charge to profit and loss was only made temporarily. But this explanation was for the jury to consider, and give such weight to it as they deemed proper. Evidence was also introduced on behalf of the defendant bank tending to show that the note given by the directors of the bank was intended as their personal promissory note, and not as collateral security for the money loaned to the bank. On the other hand, evidence was introduced on behalf of the plaintiff bank tending to show that the note was a guaranty note, intended solely as collateral security. The evidence was conflicting, and it was for the jury to determine the fact. The note was as follows:

"First National Bank.

"Jas. N. Glover, Prest. H. W. Fairweather, Vice Prest. Horace L. Cutter, Cashier. F. K. McBroom, Asst. Cashier.

"Spokane, Wash., Jan'y. 28th, 1892.

"$50,000. For value received, we promise to pay to the American Exchange National Bank of New York City, or order, in gold coin of the United States of America, any and all sums of money which the said American Exchange National Bank of New York City may loan or advance to the First National Bank of Spokane, Washington, or on its account, to the amount of fifty thousand dollars, and

with interest on such loans and advances from the time the same are made respectively, at the rate of six per cent. per annum; said payment to be made by us on demand, said advances or overdrafts being made at our special instance and request, and upon the faith of this understanding, and this obligation shall always apply to the balance of the First National Bank of Spokane, Washington, indebtedness or liability to said American Exchange National Bank of New York City, after deduction of all payments made before demand thereon.

| | |
|---|---|
| "[Signed] | James N. Glover. |
| "[Signed] | Horace L. Cutter. |
| "[Signed] | J. L. Prickett. |
| "[Signed] | H. W. Fairweather. |
| "[Signed] | J. Monaghan." |

Aside from the terms of this instrument, it is a significant fact that Cutter, while denying in his testimony that the note was intended as a guaranty for the loan to the bank, speaks of the note as a guaranty note in a letter sent by him to the plaintiff bank, inclosing the note in question. That part of the letter introduced in evidence, and marked "Exhibit A," is as follows:

"Spokane, Wash., Jan. 28th, 1892.

"Edward Burns, Esq., Cas. American Exch. Natl. Bank, New York City—Dear Sir: I inclose herewith individual guaranty note of the directors of this bank, $50,000, being ½ of the line arranged with your people when I was last in your city (Oct., 1891), to be credited as suggested by you to our special account, and applied on our active account as required. We do not know that we shall have occasion to use this, but thought best to have it with you in case we find it to our advantage to do so. * * * Horace L. Cutter, Cas."

In answer to this letter, E. Burns, cashier of the plaintiff bank, sent the following reply (Exhibit E):

"New York, Feb. 6th, 1892.

'Horace L. Cutter, Esq., Cashr., Spokane Falls, Wash.—Dear Sir: Your favor of the 28th ult. received, with inclosure, guaranty of the directors of your bank, which we file away for use whenever you get ready to call upon us. * * * E. Burns, Cashr."

Cutter, in his testimony, claimed that he had used the word "guaranty" inadvertently. The jury undoubtedly gave such weight to this statement as they saw fit. It is unnecessary to refer to other evidence introduced in this connection. The jury, as stated, returned a verdict in favor of the plaintiff bank, thereby necessarily finding that the loan was made to the bank, and not to the directors individually. But it was not only necessary that the plaintiff bank should have made the loan to the defendant bank, and not to the directors individually; but Cutter, the one who negotiated the loan or advance, must have had authority to do so from the board of directors, or else his unauthorized acts in that direction must have been ratified by the board of directors.

As was said in Bank v. Armstrong, 152 U. S. 346, 350, 14 Sup. Ct. 574, which is a case of striking similarity to that at bar:

"It may be conceded that the New York bank acted upon the theory that the loan was to the Ohio bank, and took the notes and certificates of stock as collateral. But the liability of the Ohio bank is not a necessary consequence of such a concession. It has further to be shown, that the Ohio bank was really a party to the transaction, either by having authorized Harper to effect the loan on its behalf, or by having ratified his action and having accepted and enjoyed the proceeds of the discount."

In determining this question in this case, we must return to the acts of Cutter in negotiating this loan. We find that when he returned to Spokane, Wash., he apprised the directors of what he had done. James N. Glover, president of the defendant bank, testified:

"Q. Did you have any talk with Mr. Cutter, in connection with other members of the board, after he came back, as to what he had done in that direction? A. Yes, sir; I think I remember of some little conversation with Mr. Cutter after he returned from New York, from his trip, in reference to the results of his trip. Q. Well, what did he report about that? A. Mr. Cutter stated to me that he had arranged with the American Exchange National Bank to get fifty thousand dollars, and that in case of an emergency they were to extend it to a hundred thousand. I think I asked him the question on what kind of terms he got it. He said they agreed to allow us the use of that amount of money, and charge us a very reasonable interest,—I forget now just what the interest was,—at any time that we used it, and for such amounts as we used, only. Q. What security did he say they demanded, if any? A. At that time he did not mention any security at all. Q. Well, did he afterwards? A. Well, as my recollection serves me,—of course, 'I could not have told the date,—but there was a note came along after a bit during the winter season (the winter of '92,— '91 and '92); the note that this seems to be a copy of, or the original note, perhaps,—the original, I guess. And he then stated that they had required a note of the directors,—a directors' note; and stating, of course, at the same time, that in case we did not use the money, that we would have no interest to pay; and upon that representation we signed this note that is here. That we did not require it as a bank at that time. We did not require any money, because we had plenty of money of our own at that time, but this arrangement, as I understood it, was, as I stated before, was simply to guard against trouble in case we needed money, had a run or flustration of business affairs, so that we required a little assistance, we were to have it."

Mr. H. W. Fairweather, a director and vice president of the bank, testified:

"Q. Do you remember the time when Mr. Cutter went to New York, in '91,— fall of '91? A. Yes. Q. What conversation, if any, did you have with him, either before or after, about his mission to New York, and especially with the American Exchange National Bank of that city? A. Oh! We talked the matter over with Mr. Cutter, to see if we could raise some money. He thought he could, with our Eastern correspondents at St. Paul, Chicago, and elsewhere. Q. Whom do you mean by 'we'? A. Well, that is the directors,—the board,— at an informal meeting. We were usually all in there, and we would just say, 'Let's have a meeting.' That would be call for it,—personal notice. That is the way most of our meetings were held. Q. Well, for whom were you expecting to get money, or trying to get money, arranged to get money? A. For the bank. Q. Well, what did Mr. Cutter tell you about the result of his mission to New York after he returned? A. Oh! When he came back, he said he had arranged for a fifty thousand dollar option or overdraft, in case we required it, with the American Exchange National Bank, and he had asked for a hundred, and possibly might reach a hundred. * * * Q. When, if at all, was it brought to your attention that any sort of security should be advanced? A. Oh! Not until some time the following January. Q. Well, what was the occasion at that time? A. I think Mr. Cutter then said he had promised a director's note as a sort of guaranty for this fifty thousand dollar overdraft, and that he had asked for it, and they had asked for the note."

Mr. Cutter, while denying that he had any previous authorization from the board of directors to incur a loan for the bank, admits that, when he returned, he apprised the directors of what he had done, and subsequently secured their signatures to the guaranty note. It is true that there is no record of the minutes of any meeting in which

the acts of Cutter were expressly ratified; but this is unimportant, in view of the fact that the evidence tends to show that the meetings of the board were purely informal.    As a matter of fact, no record or minutes were kept of the proceedings of any of the meetings thus informally held, except at the regular meetings of the board; and the evidence shows that but two or three regular meetings were held during the year.    The other meetings were entirely informal; that is, they occurred generally during business hours, and whenever a sufficient number of directors were present.    It affirmatively appears that this was the custom of the directors.    As stated, no minutes of these frequent informal meetings were kept, and the recollection of those directors who testified as to what took place or what was said does not now seem to be very clear.    But, however this may be, a stronger evidence of ratification can hardly be imagined than when all the directors, excepting one, who was then absent from the state, signed the guaranty note.    It is true that Cutter denies that it was signed or intended as a guaranty note, and Glover testifies that he did not understand that it was a guaranty note; but, on the other hand, both Clarke and Burns, respectively vice president and cashier of the plaintiff bank, and Fairweather, one of the directors of the defendant bank, and one of those who signed the note, testify that the money was loaned to the bank, and that the note was intended as a guaranty note.    This conflict in the evidence was for the jury to determine.    Further evidences of a ratification, which the jury were entitled to consider, were the fact that the interest on the amount loaned was charged up to the defendant bank, and not to the directors individually, as has been already indicated; that on the 5th of June, 1893, shortly before the defendant bank closed its doors, a telegram was sent by the defendant bank through Cutter, as cashier, to the plaintiff bank, asking for the additional $50,000, which Cutter had stated he might desire to draw on the plaintiff bank in case his bank, in a period of emergency, should require that further sum. The jury were entitled to consider all of these facts and circumstances in determining whether or not there was a ratification, express or implied, by the board of directors.    As the verdict was a general one, the court cannot say whether the jury found that the loan was made upon a previous authorization or a ratification.    But, in any event, the verdict would stand; for we think there was sufficient evidence to go to the jury of a ratification of Cutter's acts as cashier and director, within the rule laid down in Bank v. Armstrong, supra. There it appeared that one E. L. Harper, vice president and general manager of the Fidelity National Bank of Cincinnati, Ohio, had borrowed the sum of $200,000, which was secured by collateral notes signed by one A. P. Gahr, and indorsed by said E. L. Harper.    The money was borrowed from the Western National Bank of New York. The latter bank brought suit against the receiver of the Fidelity National Bank of Cincinnati, Ohio, alleging that the Fidelity National Bank was indebted to the complainant bank in the sum of $207,290, on account of a loan made on May 28, 1887, by the New York Bank to the Ohio Bank, "at the special instance and request of E. L. Harper, who was then the vice president and general manager of the

said Fidelity National Bank, with full authority to make said loan on its behalf." The answer denied that the Fidelity National Bank was indebted to the complainant bank; that the complainant had on May 28, 1887, or at any time, loaned the Fidelity National Bank the sum of two hundred thousand dollars, or any other sum; and alleging that the notes mentioned in the bill, made by A. P. Gahr, and indorsed by E. L. Harper, were discounted by the complainant bank for said Harper, and that the proceeds of such discount were received by said Harper; that the said notes were at no time the property of the Fidelity National Bank; and that the Fidelity National Bank never had any interest in said transaction, and was in no way responsible therefor. The cause was tried, and a decree entered dismissing the bill. On appeal to the supreme court, the decree was affirmed, it being held that the said Harper had neither been authorized to borrow the money, nor had his action in so doing been ratified by the board of directors of which he was vice president. Mr. Justice Shiras, in delivering the opinion of the court, said:

"Even, therefore, if it be conceded that it was within the power of the board of directors of the Fidelity National Bank to borrow $200,000 on time, it is yet obvious that the vice president, however general his powers, could not exercise such a power unless specially authorized so to do; and it is equally obvious that persons dealing with the bank are presumed to know the extent of the general powers of the officers. Without pursuing this part of the subject further, we think it evident that Harper had no authority to borrow this money, and that the bank cannot be held for his engagements, even if made in behalf of the bank, unless ratification on the part of the bank be shown. It is scarcely necessary to say that a ratification, to be efficacious, must be made by a party who has power to do the act in the first place,—that is, in the present case, the board of directors; and that it must be made with knowledge of the material facts. There is not the slightest evidence shown in this record that the board of the Fidelity National Bank, by any act, formal or informal, undertook to ratify Harper's action in the premises, or that they ever had any knowledge of the transaction."

Bringing the present case within the rule of ratification laid down in the case just cited, we think there was sufficient evidence of a ratification to call for the judgment of the jury. The fact, also, that the defendant bank used the money, drew on it in the usual course of its business between the two banks, would tend to bring the case within the doctrine recognized in the case just cited, "that a corporation may become liable upon contracts assumed to have been made in its behalf by an unauthorized agent by appropriating and retaining, with knowledge of the facts, the benefits of the contracts so made in its behalf." See, also, Bank v. Patterson, 7 Cranch, 299; Bank v. Dandridge, 12 Wheat. 64; Zabriskie v. Railroad Co., 23 How. 381; Gold Mining Co. v. National Bank, 96 U. S. 640; Gas Co. v. Berry, 113 U. S. 322, 327, 5 Sup. Ct. 525; Pennsylvania R. Co. v. Keokuk & H. Bridge Co., 131 U. S. 371, 381, 9 Sup. Ct. 770. While the evidence in some respects may not be as strong and satisfactory as might be desired, still, in our opinion, there was sufficient to go to the jury, and their verdict should not be disturbed. The action of the court below in declining to instruct the jury to find for the plaintiffs in error was therefore proper, and is not error. This disposes of the 1st assignment of error.

The 2d, 3d, 4th, 5th, 6th, 7th, 8th, and 9th assignments of error relate to instructions given to the jury. We are of opinion that there was no material error, to the prejudice of the plaintiffs in error, committed by the court in these instructions. They appear to be proper and fair, and to state the law, as applied to the evidence presented in the case, clearly and fully.

The 10th assignment relates to the refusal of the court to instruct the jury that, unless all of the members of the board of directors were present or notified to be present, any action taken by the board in connection with the $50,000 loan would not be binding on the bank, without the further qualification subjoined that, if any member of the board of directors was absent and beyond the reach of notice within a reasonable time, a valid meeting of the board might be held without his being present, or without his being actually notified, so long as a quorum of the board were present or were notified. The court explained to the jury that the by-laws of the company, as introduced in evidence, did not, nor did the law, prescribe the kind of notice; that a good notice might be given by a writing specifying the time and place and object of the meeting, delivered to or sent by mail to each of the directors, or a messenger might be sent to notify the directors to meet, or they might notify each other of the time and place of meeting, or if the directors had a stated time for meeting, which they all knew about, a meeting held at that time and that place would be deemed a meeting of which all had notice; and if it was the regular custom, pursued for a number of years, for the directors to hold a meeting and transact the business of the bank at the banking house during business hours whenever a sufficient number were present, that custom would carry with it a notice to each of the directors of a meeting to be held within the business hours of the bank for transacting the banking business, and whenever a sufficient number were there assembled, and took action upon the business of the bank within the powers of the board of directors, it would be deemed a meeting held, of which all the members of the board had notice. These remarks accorded with the evidence in the case about the manner in which the meetings were held, and appear to be proper and correct. It appeared that Cyrus Happy, one of the directors of the defendant bank, was not present at some of the meetings, and that he was absent from the state during the month of May, 1893, shortly before the bank closed its doors.

Dillon, in his work on Municipal Corporations (2d Ed.) p. 319, § 200, says:

"All corporators are presumed to know of the days appointed by the charter, statute, usage, or by-laws for the transaction of particular business; and hence no notice of such meeting for the transaction of such business is necessary, or for the transaction of the mere ordinary affairs of the corporation on such days: yet, if it is intended to proceed to any other act of importance, a notice is necessary, the same as at any other time."

Section 201. "A notice, when necessary, must, if practicable, be given to every member who has a right to vote."

See, also. Thomp. Corp. § 3938; 17 Am. & Eng. Enc. Law, p. 85; Paola & F. R. Ry. Co. v. Commissioners of Anderson Co., 16 Kan. 308; Bank of Middlebury v. Rutland & W. R. Co., 30 Vt. 159, 170; Waite v.

Mining Co., 37 Vt. 608; Edgerly v. Emerson, 23 N. H. 555. In the case last cited, it was held that a corporation is bound where a quorum of the directors meet and unite in any determination, whether the other directors are or are not notified. In Chase v. Tuttle, 55 Conn. 455, 12 Atl. 874, it was held that the failure on the part of some of the directors, who were out of the state, to receive notice, does not invalidate the action of the majority, forming a legal quorum at such meeting. It is to be observed, further, that section 21 of the by-laws of the defendant bank provided that:

"The board of directors hold meetings at the banking house of said corporation as often as seems necessary, or at such times as they shall by resolution designate. The president shall preside at such meetings. A majority of the number of directors shall constitute a quorum, and by a vote representing a majority of the number of directors may transact business and determine any proposition."

The evidence clearly showed that it was the custom of the directors to hold meetings whenever they deemed the same necessary; that they generally held informal meetings during business hours whenever there was a sufficient number to constitute a quorum. It is not pretended that any of the directors were not aware of this custom. Under the evidence as presented, we fail to find any error in the refusal of the court as above indicated.

The assignments of errors from and including the 11th to and including the 57th (excepting, however, the 35th and 36th) relate to the admission and rejection of evidence. We fail to detect any material error committed by the court below in any of its rulings in this respect. The evidence, admitted over the objections of the plaintiffs in error, which is assigned as error, related to, and was introduced for the purpose of showing, the true state of facts surrounding the arrangements which were made for this loan or overdraft; also, to show a previous authorization or a subsequent ratification of Cutter's acts in relation thereto. The evidence so admitted was, in our opinion, competent, relevant, and material. The rulings of the court in rejecting the evidence indicated by the several assignments were proper and correct.

Assignments of error numbered 35 and 36 have already been considered by us. They related to the admission of the depositions of the witnesses Clarke and Burns.

The 57th and 59th assignments of error were practically decided by the first assignment. The 57th relates to the refusal of the court to grant a nonsuit, and the 59th is that the verdict was contrary to law and the evidence. There does not appear to be any 58th assignment of error.

For the reasons given above, the judgment of the court below should be affirmed; and it is so ordered.