## SMITH et al. v. MOORE.

(Circuit Court of Appeals, Ninth Circuit. October 7, 1912.)

No. 2,067.

1. EVIDENCE (§ 352*)—CORPORATE BOOKS—ENTRIES AGAINST MAJORITY STOCK-HOLDERS—PRESUMPTION.

   Under Civ. Code Mont. 1895, § 540 (Rev. Codes, § 3902), providing that all corporations for profit shall keep a record of all business transactions, it will be presumed that all entries made in the books of the corporation against the president and controlling stockholder were rightfully made, such books being therefore admissible against him and his personal representatives in an accounting against him arising out of the fraudulent purchase of certain shares of the corporation's stock from the executor of a deceased owner.

   [Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1398–1403; Dec. Dig. § 352.*]

2. CORPORATIONS (§ 155*)—FUNDS—WITHDRAWAL—DIVIDENDS—DECLARATION.

   Where the owner of a majority of the stock in a private corporation fraudulently purchased the stock of a deceased stockholder from his executor, and thereafter profits were divided and paid to such majority stockholder, he was accountable therefor as dividends on the stock so fraudulently purchased, though they were not formally declared as dividends by the directors of the company.

   [Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 560–563, 568, 576–578, 593–603; Dec. Dig. § 155.*]

3. CORPORATIONS (§ 1*)—NATURE—LEGAL ENTITY—FRAUD.

　　A corporation will be regarded as a legal entity, separate and distinct from its stockholders, unless such consideration is offered to defeat public convenience, justify wrong, protect fraud, or defend crime, in which case the corporation will be regarded as an association of persons.

　　[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1, 3–6; Dec. Dig. § 1.*]

4. EXECUTORS AND ADMINISTRATORS (§ 149*)—SALE OF ASSETS—FRAUD—ACCOUNTING—EVIDENCE.

　　In a suit to set aside an executor's sale of corporate stock to the owner of the controlling interest in the corporation, the sale having been declared fraudulent, evidence *held* to warrant the finding that the profits of the corporation distributed to such stockholder between the date of the sale and the vacation thereof amounted to a sum at least equal to that received by the beneficiary under the purchase, and that she was, therefore, not required to return anything as a condition to receiving a return of the stock.

　　[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 602–606; Dec. Dig. § 149.*]

Appeal from the Circuit Court of the United States for the District of Montana.

Suit by Nellie Mae Moore against John M. Smith and others. Decree for complainant, and defendants appeal. Affirmed.

This is the second time this case has been brought here. On the first occasion the present appellee was the appellant, and the present appellants the appellees. The opinion of this court on that appeal will be found reported in (C. C. A.) 182 Fed. 540, where the facts out of which the cause arose will be found fully stated, and which appeal resulted in the reversal of the then judgment of the trial court, with directions to it "to enter a decree for the complainant to the effect that upon the return to the representative of the estate of John M. Smith, deceased, of the money received by her for her interest in the stock from her guardian, with legal interest thereon, her proportion of the stock be returned to her, and providing for an appropriate accounting on her behalf, and for such proceedings as may be requisite and appropriate as will place her in such position as she would have been in if the sale of said stock had not been made, and with costs."

In brief, the main facts are: That for many years John M. Smith and William A. Smith, who were brothers, were the owners of a large amount of land in the state of Montana, upon which they carried on the sheep, cattle, and horse business. At first they managed the business as partners, but in 1890 they organized a corporation under the laws of Montana under the name of Smith Bros. Sheep Company, to which corporation they conveyed all of the property of the firm. Each of them was married, and to the wife of each was given 5,000 shares of the capital stock of the company, which amounted to 250,000 shares of the par value of $1 a share. The remainder of the stock was divided equally between the brothers. The wife of William A. Smith deserted him in 1891, leaving three small children, the eldest a boy then seven years old, and two younger girls, the elder of whom is the present appellee. Napoleon B. Smith was the nephew of William A. and John M. Smith, and an attorney at law residing at White Sulphur Springs, Meagher county, Mont., in which county most of the property of the brothers was situated, and in which they both resided. William A. Smith died there on February 13, 1897, and on his deathbed made his will, which was drawn by Napoleon B. Smith, by which will he left all of his estate to his three children, and appointed his said nephew executor thereof. John M. Smith was himself then in poor health, as was his wife, in consequence of which they spent much of their time in Pasadena, Cal. Shortly after the business was incorporated, one McNaught, who was a brother-in-law of John M. Smith, became manager of the property

─────────────────────────────────────────────

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

under the direction and supervision of the latter, and he was subsequently succeeded as such manager by one Flatt, who was also a family connection. At the time of his death William A. Smith was the owner of 122,950 shares of the stock of the Smith Bros. Sheep Company, John M. Smith then owning a majority of the stock; and upon the probate of the will of William A. Smith Napoleon B. Smith was appointed its executor, and as such subsequently sold all of the stock of William A. Smith, deceased, to John M. Smith, who had been appointed and then was guardian of the children, which sale this court on the former appeal adjudged fraudulent and void as against them. One hundred shares of the stock of the company had been divided between N. B. Smith and McNaught to qualify them as directors, and the 50 shares standing in the name of McNaught were transferred to Flatt in 1901, when he succeeded McNaught as manager of the ranch. Neither N. B. Smith nor Flatt claimed to own the stock so standing in their names, but held it in trust for John M. Smith.

On the going down of the mandate from this court pursuant to its decision on the former appeal, an interlocutory decree was entered by the court below in accordance therewith, referring the case to a master to ascertain and determine "what amount of money was received by the complainant from John M. Smith, deceased, for her undivided one-third interest in the stock of the Smith Bros. Sheep Company, referred to in the bill of complaint herein, to wit, 122,950 shares, claimed to have been purchased by the said John M. Smith from the defendant Napoleon B. Smith as executor of the last will and testament of William A. Smith, deceased, and likewise to ascertain and determine the amount of such payments with legal interest thereon to the date of his report, figuring interest on each payment made to or on behalf of the complainant by said John M. Smith, deceased, at the legal rate of interest from the time such payment was actually made," and likewise to ascertain and determine "what amount of money has been received by and paid to said John M. Smith or the said Mary M. Smith as executrix of the estate of John M. Smith, deceased, by said Smith Bros. Sheep Company, as dividends upon said stock of complainant, being an undivided one-third interest in said 122,950 shares of said stock of said Smith Bros. Sheep Company, since the 23d day of May, 1899, with interest thereon at the rate of 8 per cent. per annum to the date of the report of said master, interest to be figured on each sum so paid said John M. Smith or said Mary M. Smith as such executrix, as dividends upon the said stock of complainant from the date said dividend or dividends were received by them or either of them from said Smith Bros. Sheep Company down to the date of said report, and making annual rests in such computations"; and, further, to ascertain and determine "the difference between the amount so found to be due from the said John M. Smith and the said Mary M. Smith as executrix of the estate of John M. Smith, deceased, to the complainant, and the amount so found to be due to the said John M. Smith and the said Mary M. Smith as executrix of the estate of John M. Smith, deceased, from the complainant."

The interlocutory decree contained this further clause: "Upon the accounting hereby ordered, so much of the testimony heretofore taken as is pertinent to said accounting and the matters properly included therein shall be available to either of the parties, and shall be considered by the master as though taken for the purposes of said accounting, said testimony to be subject, however, to any and all objections as to its competency, relevancy, and materiality that either party may desire to make thereto or to any part or portion thereof, but either party may submit additional testimony in relation to the statement of said account as herein designated and defined."

In denying a motion made by the complainant in the cause for leave to amend the bill so as to bring within the scope of the accounting ordered moneys of the corporation claimed to have been appropriated and converted by John M. Smith prior to as well as after the date of the sale of the stock, and in making the interlocutory decree referred to, the court below in its opinion accompanying it said, among other things: "The sole and only object of the suit as exhibited by complainant's bill was the vacating and setting aside of the sale of complainant's proportional amount of the shares of stock of the defendant company, and a return of the same to the plaintiff, and an

accounting by the defendant John M. Smith of the 'profits, dividends, and increments thereof and which have accrued thereon.' There is no suggestion made or intimation given by the bill that prior to or since the sale of the stock in question John M. Smith received from the defendant corporation or appropriated to his own use any funds belonging to the corporation other than such as had accrued as dividends or profits upon the stock held by him. * * * The scope of the accounting to be had is therefore limited by the bill itself to one between the complainant and the representative of the John M. Smith estate, and confined to the amounts received by the deceased in his lifetime, and since his death by the representative of his estate, as profits, dividends, or increments upon the shares of stock. * * * As has been said, the purpose of the suit was the cancellation of the sale of the stock and an accounting of profits accrued thereon. * * * The accounting will therefore be confined to such amounts as John M. Smith may have received during his lifetime as dividends upon the stock since the date of the sale of the stock to him, and as may have been received by the representative of his estate since his death to the present time. In using the term 'dividends,' it is not intended to restrict the accounting to such amounts as may have been received as formally declared dividends, but the term is intended to apply to all amounts received in consequence of any division of the profits of the corporate business, whether for the purpose of such division a formal dividend was declared by the proper officers of the corporation or not. A division of the profits without the formality of declaring a dividend is equivalent to declaring a dividend, and such division of the profits is a dividend even though not called such and not considered such by the directors and stockholders."

The result of the findings and report of the master showed the extinction of the obligation on the part of the appellee by her proportionate share of the moneys received and appropriated by John M. Smith, with a balance due her of $25,825.94, which findings and report were approved by the court below and its final decree entered accordingly.

The appeal is from that decree.

R. Lee Word, of Helena, Mont. (L. O. Evans, of Butte, Mont., of counsel), for appellants.

William Scallon, of New York City, and Thomas J. Hoolan and Walsh & Nolan, all of Helena, Mont., for appellee.

Before GILBERT and ROSS, Circuit Judges, and WOLVERTON, District Judge.

ROSS, Circuit Judge (after stating the facts as above). To the report of the master numerous exceptions were filed on behalf of the defendants to the cause. Among the findings of the master excepted to by the defendants and approved by the court is the following:

"Total amount of money received by and paid to John M. Smith by Smith Bros. Sheep Company as informal dividends since the 23d day of May, 1899, with interest thereon at 8 per cent. per annum, with annual rests, to the 23d day of May, 1911 (See Complainant's Exhibit A—24) $401,008.45"

—from which appears deducted as improperly charged to John M. Smith certain items aggregating $68,380.87. The case shows that the books of the Sheep Company contain the only record of John M. Smith's transactions with it. They were kept by McNaught during the time he acted as manager of the company under John M. Smith's directions, and thereafter by one Flatt, and contained a ledger account with John M. Smith. The account opens in Jan-

uary, 1897, and shows at the end of that year a balance due from Smith to the company of $8,324.38. This balance is carried into the account as a debit at the beginning of 1898, and the balance for that year, $14,682.70, is carried over to the next year, the account for which is opened with it. In the early part of 1899 John M. Smith made the purchase from the executor of the estate of the deceased, William A. Smith, which was held fraudulent and void by this court on the former appeal. And in the account of John M. Smith with the company no balance is struck at the end of the year 1899, nor is any balance carried over into the account for 1900. The account for the latter year appears balanced by this entry on the credit side: "P. & L. $17,507.02." That P. & L.—evidently profit and loss—item is not carried over to the next year, but a new account opened as at the beginning of 1900. At the end of 1901 is an entry on the credit side "By dividends $7,500," and the balance—$1,098.85—is carried over to the beginning of the account for 1902, which account does not appear to have been balanced, and nothing is carried from it to the account for 1903. At the close of the account for 1903 is a credit entry of "D. I. to balance $19,232.-45." The accounts for 1904, 1905, and 1906 consist of various debit items, and that of 1907 of various debit items and one "Credit by dividends, 900.50" at the bottom of which account are the words: "The above all settled by John and May (or Mary)—[in red ink]." According to the testimony of the complainant's expert witness, J. C. Ricker, the aggregate of the withdrawals shown by the account over the credits shown by it down to 1907 was $211,302.38, which amount was somewhat reduced by further credits to which John M. Smith was entitled, as shown on the trial. In 1907 this suit was begun, and thereafter dividends were declared by the board of directors of the company as will afterwards appear.

The main contentions on the part of the appellants are that the debtor balances shown by the John M. Smith accounts cannot be properly considered as dividends or profits received by him, that there was no proof that the Smith Bros. Sheep Company had any profits on hand out of which dividends could be declared or profits divided, and that dividends can only be paid by a corporation after being regularly declared by its board of directors, and that prior to the year 1907 it is not pretended that any dividends were so declared, from all of which it is urged on their behalf that for such debts he, and subsequently his estate, became liable to the Sheep Company, and that whatever of such moneys belong to the appellee as the owner of stock in that corporation can only be first collected through the corporation, and thereafter from the representative of the estate of the deceased John M. Smith.

It appears that John M. Smith subsequent to the death of his brother owned a majority of the stock of the Sheep Company, and that, after he acquired from the executor of his brother's estate all of the stock of the latter, he and his wife together held nearly all of the stock, the few remaining shares being held by relatives,

those held by the other directors being held in trust for him. So that John M. Smith was not only the holder of a large majority of the stock, but was in absolute control of the board of directors and of all of the affairs of the corporation. The suggestion on the part of the appellants that there were no profits out of which dividends could have been paid is negatived by the record. Evidence introduced by them is to the effect that from the time Flatt succeeded McNaught in 1901 the only minutes of the meetings of the directors of the Smith Bros. Sheep Company until after the commencement of this suit in 1907 were kept on sheets of paper, which were offered in evidence by the appellants. They are the following exhibits:

### "Defendants' Exhibit A—1.

"At a meeting of stockholders of Smith Bros. Sheep Company held at their office on ranch Sept. 14th, 1903,
"The following stockholders were present:
"J. M. Smith    representing  193,900 shares.
"Mary M. Smith       "         56,000    "
"W. W. Flatt   representing      50 shares.
"N. B. Smith        "           50 shares.
"Moved and seconded that J. M. Smith act as chairman of meeting, motion carried.
"Moved and seconded N. B. Smith act as secretary of the meeting. Motion carried.
"By unanimous vote of all the stockholders J. M. Smith, Mary M. Smith, and N. B. Smith were elected trustees for the ensuing year.
"The following resolution was unanimously adopted:
"Resolved that J. M. Smith, president of Smith Bros. Sheep Company be and is hereby authorized to sell, deed and transfer in the name of said company all lands which said company owns in the county of Park, state of Montana.
"The following resolution was unanimously adopted:
"Resolved that J. M. Smith, president of Smith Bros. Sheep (Company), be and is hereby authorized to sell, deed and transfer all lands which said company owns in Sec. 13, Tp. 8 N., R. 9 East.
"No further business appearing on motion meeting adjourned.
                                          "N. B. Smith, Secretary."

### "Defendants' Exhibit A—2.

"At regular meeting of the trustees of Smith Bros. Sheep Company, held at their ranch on the 10th day of September, 1904, present at said meeting J. M. Smith and Mary M. Smith, and N. B. Smith trustees.
"The following officers were duly elected for the ensuing year as officers of said company:
"J. M. Smith, president.
"N. B. Smith, vice president and treasurer.
"W. W. Flatt, secretary.
"On motion W. W. Flatt's salary was fixed at $200.00 per month.
                                          "N. B. Smith, Secretary."
"At a regular meeting of the stockholders of Smith Bros. Sheep Company held at ranch of said company on the 10th day of September, A. D. 1904, present at said meeting the following stockholders: J. M. Smith, Mary M. Smith, N. B. Smith, W. W. Flatt, being all the stockholders of said company. J. M. Smith was elected temporary chairman and N. B. Smith secretary.
"J. M. Smith, Mary M. Smith, and N. B. Smith were unanimously elected trustees for the ensuing year.
"On motion the meeting was adjourned.      "N. B. Smith, Secretary."

"Defendants' Exhibit A—3.

"At a special meeting of trustees of Smith Bros. Sheep Company held at their ranch in Meagher County, State of Montana, Aug. 21, 1905.

"Present, J. M. Smith, Mary M. Smith and N. B. Smith, trustees.

"On motion W. W. Flatt's salary for year commencing Sept. 1905 was fixed at $200.00 per month.                N. B. Smith, Secretary."

"Defendants' Exhibit A—4.

"Meeting of trustees of Smith Bros. Sheep Company, held at office of said company near Martinsdale, Montana, Aug. 23, 1906.    Present at meeting: John M. Smith, Mary M. Smith, and N. B. Smith, trustees.

"On motion John M. Smith was elected chairman and N. B. Smith secretary.

"On motion of N. B. Smith, John M. Smith was elected president. On motion of Mary M. Smith, N. B. Smith was elected vice-president of said company.    On motion of N. B. Smith, W. W. Flatt was elected secretary and manager of said company.

"No further business appearing the meeting was, on motion, adjourned.
                "N. B. Smith, Secretary."

"Annual meeting of the stockholders of Smith Bros. Sheep Company, held at the office of said company on ranch near Martinsdale, Mont., Aug. 23d, 1906.

"Present at meeting: John M. Smith, representing 198,950 shares, Mary M. Smith, representing 50,950 shares, N. B. Smith, representing 50 shares, W. W. Flatt, representing 50 shares of stock of company. On motion John M. Smith was elected chairman and N. B. Smith secretary of the meeting. The following-named parties were elected trustees by unanimous vote of all 'stock of company, to wit: John M. Smith, Mary M. Smith, and N. B. Smith for ensuing year.

"On motion John M. Smith as president was duly authorized to execute a deed to Mary M. Smith for lots 3 and 4 in block 'O' 17 of the original townsite of Lewistown according to official plat of said townsite on file in office of clerk and recorder of Fergus county, for consideration of ten thousand dollars.

"No further business appearing the meeting adjourned.
                "N. B. Smith, Secretary."

As has been stated, this suit was commenced in 1907, and the record shows these further minutes:

"Defendants' Exhibit A—5.

                "Smiths Ranch, August 17th, 1907.

"Meeting of trustees of Smith Bros. Sheep Company held at ranch of said company on the 17th day of August, 1907. Present at meeting: John M. Smith, Mary M. Smith and N. B. Smith, trustees of said company. John M. Smith, president, presided at said meeting. Minutes of the previous meeting read and approved. N. B. Smith moved that company declare a dividend for year 1907, of ten per cent. on the capital stock of company. The motion was seconded by Mary M. Smith and was carried by unanimous vote of all trustees. No further business appearing the meeting adjourned.
                "W. W. Flatt, Secretary."

                "Martinsdale, Mont., Sept. 14th, 1907.

"Meeting of trustees of Smith Bros. Sheep Company held at office of the company on its ranch in Meagher county, Montana, on the 14th day of September, 1907. Present at said meeting, Mary M. Smith and N. B. Smith trustees of said company.    At said meeting the following officers of said company were elected for the ensuing year: J. M. Smith, president, N. B. Smith, vice president, W. W. Flatt, secretary. It was moved and carried that the company borrow from John M. Smith for the period of one year the sum of ten thousand four hundred ninety-nine & 50/100 dollars with interest at the rate of five per cent. per annum.    On motion, the officers, president and secretary, were authorized to go ahead and complete the purchase of state lands heretofore selected by president and secretary and contracted for by

said officers. On motion dividend of twenty per cent. was declared on capital stock of the company, ten per cent. payable at *one* and remaining ten per cent. payable November 15th, 1907. No further business appearing the meeting adjourned.                                        W. W. Flatt, Secretary."

"Defendants' Exhibit A—6.

"Martinsdale, Mont., Sept. 14, 1907.

"Annual meeting of the stockholders of Smith Bros. Sheep Company held at the office of said company in Meagher county, Montana, on the 14th day of September, 1907. The whole of the capital stock of said company was represented by stockholders present and by proxy as follows: Mary M. Smith, 51,000 shares, John M. Smith; by Mary M. Smith, 164,000 shares, W. W. Flatt, 25,000 shares, Lizzie Flatt, 5,000 shares, and N. B. Smith, 5,000 shares. Mary M. Smith was elected president and N. B. Smith secretary of said meeting. John M. Smith, Mary M. Smith, and N. B. Smith were, by unanimous vote of all the stock of said company, elected trustees of the company for the ensuing year. On motion, unanimously carried, all the acts and transactions of the trustees and officers of the company for the past year were approved. On motion unanimously carried, the trustees were authorized to declare a twenty per cent. dividend for year 1907, payable in two payments of ten per cent. each at such times as the trustees may designate. No further business appearing the meeting adjourned.                    N. B. Smith, Secretary."

"Defendants' Exhibit A—7.

"Martinsdale, Mont., Sept. 15, 1908.

"Annual meeting of stockholders of Smith Bros. Sheep Company held at the office of said company, on ranch of said company, in Meagher county, state of Montana, on the 15th day of September, 1908. The whole of the capital stock of said company was present and represented by stockholders present and by proxy as follows: John M. Smith, 164,000 shares, Mary M. Smith, by John M. Smith, proxy, 51,000 shares, W. W. Flatt, 25,000 shares, Lizzie Flatt, 5,000 shares, N. B. Smith, 5,000 shares. John M. Smith was elected president and N. B. Smith secretary of said meeting. John M. Smith, Mary M. Smith and N. B. Smith were, by unanimous vote of all the stock of said company, elected trustees of said company for the ensuing year. On motion unanimously carried, all the acts and transactions of the trustees and officer of said company for past year was approved. On motion unanimously carried the trustees were authorized to declare a five per cent. dividend payable at such time as trustees may designate. No further business appearing the meeting adjourned.                           N. B. Smith, Secretary."

"Defendants' Exhibit A—8.

"Martinsdale, Mont., Sept. 15, 1908.

"Meeting of trustees of Smith Bros. Sheep Company held at the office of said company, on ranch of said company in Meagher County, Montana, on the 15th day of September, 1908. Trustees present at meeting: John M. Smith and N. B. Smith. At said meeting the following officers were elected for ensuing year: John M. Smith, president, N. B. Smith, vice president, and W. W. Flatt, secretary. On motion made and carried a dividend of five per cent. was declared on capital stock of said company, dividend payable at this date. On motion the president or in his absence the vice president of the company was authorized to deed to Andrew Berg all of Sec. 13, Tp. 8 N., R. 9 East in Meagher county, Montana, except the N. E. ¼, provided the said Andrew Berg will deed to the company the S. E. ¼ of Sec. 18, Tp. 8 N., R. 10 East in said Meagher county besides paying to said company the sum of four hundred and eighty dollars. No further business appearing the meeting adjourned.                        Secretary, W. W. Flatt."

The capital stock of the Sheep Company consisting of 250,000 shares of the par value of $1, it will be seen that the dividend thus declared August 17, 1907 was $25,000, that declared September 14,

1907, $50,000, and that declared September 15, 1908, $12,500, and there is evidence going to show that the business of the company was profitable at all times after the death of William A. Smith. Such books of account of its business as were kept were kept under the supervision and control of John M. Smith.

[1] The statute of the state required that all corporations for profit should keep a record of all their business transactions. Montana Civil Code, § 540 (Rev. Codes, § 3902). McNaught was his brother-in-law, and Flatt was also a family connection. John M. Smith was not only a director of the company, but its president, general manager, and in control of all of its operations, financial and otherwise. Under such circumstances, the books were admissible in evidence, and no presumption can be indulged that any entry made in them against him was erroneous. On the contrary, the presumption is that all such entries were rightly made. His position was that of trustee, and it was incumbent upon him to see that proper books of account were kept. Bacon v. United States, 97 Fed. 35, 38 C. C. A. 37; San Pedro Lumber Co. v. Reynolds. 121 Cal. 74, 53 Pac. 410; 2 Encyc. of Evidence, 678; Cook on Stock (4th Ed.) 727, note.

[2] He cannot escape accountability upon the contention that prior to 1907 there was no formal declaration of dividends, nor, under the circumstances appearing, can any of the appellants be heard to say° that the moneys shown by the books to have been withdrawn by John M. Smith during the period in question were ever intended by him or expected by them to be repaid to the corporation. In the first place, while it is true that in general a corporation is a distinct entity from its stockholders, nevertheless, where an individual owns practically all of its stock and controls all of the operations of the corporation, they are, in proper cases, regarded by the courts as one and the same. We had a case of that sort before us at the last term—Linn & Lane Timber Co. et al. v. United States (C. C. A.) 196 Fed. 593—where will be found a reference to a number of cases to that effect. So may a court of equity, which always looks through the form to the substance of things, avoid the necessity of driving a wronged party to a circuity of actions, and treat as dividends all amounts received in consequence of a division of the profits of the corporate business, as the court below directed the master to do, and as he did do, as shown by his report confirmed by the trial court.

In the case of Groh's Sons v. Groh, 80 App. Div. 85, 80 N. Y. Supp. 438, the corporation in question. grew out of a partnership. Until April 16, 1897, the stock of the corporation was owned by John Groh and his mother, Julia Groh. On that day one Flammer bought the stock of the mother. In passing upon the questions which arose in the case the court said:

"When Flammer assumed control of the corporation on April 17, 1897, John Groh directed Schwarzer to draw two checks—one for $5,241.65 and the other for $1,521.47. The bookkeeper testifies that, after the checks were drawn, John Groh went to the desk of Mr. Flammer, in the same office, and said: 'Here is two checks I wish you to sign. They are moneys due me from

the old firm. Mr. Flammer said, "Well, if you say they are all right, I will sign them." ' They were thereupon signed and handed to Groh. Of the proceeds of these checks John Groh paid one-half to his mother. The fact that he had these two checks and their proceeds is undisputed. John Groh's estate, therefore, is liable to pay the same, unless it is made to appear that he and his mother were entitled to receive this sum of money as due to them from the corporation. It is claimed by the defendant that such is the fact; that these persons were entitled to have and receive such sums as profits or earnings upon their stock in the corporation between December 30, 1896, and April 17, 1897, during which time they were the owners and holders of all the stock, and would be entitled to a dividend therefrom, if in fact it had been earned and declared. · The corporation at this time was a family affair. It had changed none of its business methods from what had existed when it was a partnership. John Groh and his mother owned all the stock and bonds. They were a majority of the board of directors. The third member was an employé, and followed Groh's instructions. All the offices of the corporation were held by John Groh and his mother, and the former conducted the business of the corporation without going through the form of holding directors' meetings, or evidencing any act of the corporation by written minutes. In so far as John Groh dealt with third parties in connection with the business carried on by the corporation, he could create a legal liability against it, and a third party would not be driven to the necessity of showing a resolution authorizing such dealing, or other minute vesting him with authority to act. Under such circumstances, the business of the corporation may be lawfully carried on without formal votes, and, if the obligation incurred is within the general scope of the business of the corporation, the transaction will be upheld, and the third party need not prove formal action, to establish the liability of the corporation. Sheridan Electric L. Co. v. Chatham Nat. Bank, 52 Hun, 575, 5 N. Y. Supp. 529; affirmed on appeal, 127 N. Y. 517, 28 N. E. 467; Hall v. Herter, 83 Hun, 19, 31 N. Y. Supp. 692; s. c. on another appeal, 90 Hun, 280, 35 N. Y. Supp. 769; affirmed on appeal on opinion below, 157 N. Y. 694, 51 N. E. 1091. As between the owners and holders of all the stock of the corporation, it must, in principle, follow that the members of such corporation, entitled to receive dividends, may agree among themselves, either by conversation or otherwise, to appropriate of the funds of the corporation a specified sum, as agreed upon, and distribute the same; and the stockholder, upon the receipt of it, will acquire good title thereto as against the other members of the corporation. It amounts to a mere division of the property by agreement of all the parties in interest, and, as between them, it is perfectly good, and may not be attacked, where the act does not impair the rights of third parties. * * * Equitably, Mrs. Groh and her son were entitled to the profits which the stock of the corporation had earned during the time they were the exclusive owners thereof. The defendant Flammer by his purchase did not acquire the right to such profits, unless it was understood that no dividend was to be paid therefrom. The profits having been earned, and Mrs. Groh and her son being equitably entitled thereto, they had the right to agree upon the withdrawal of a sum which should not exceed their interest prior to the time when Flammer's interest attached. That they did so agree is meagerly established by the testimony, but enough, we think, appeared to authorize the jury so to find. Mrs. Groh understood that she was to have and receive the sum of money on account of this matter. What its exact amount was she did not know. Nobody could have known from the manner and method in which the business was conducted. That John Groh so understood it is also made clear. His mouth is closed, but the fact that he made the claim that this sum was due him, and that he asserted such claim when the checks were drawn and signed, had previous to that time negotiations with his mother, and subsequently gave to her one-half of such proceeds, is sufficient evidence from which the jury could find that the agreement to distribute this sum of money was made between them, and that such sum represented the earnings of their stock for the period of time they were exclusively entitled to have and receive the same. We think, therefore, that the jury were authorized to find that the plaintiff was not entitled to recover upon any of its causes of action."

The judgment in that case was reversed by the Court of Appeals upon the ground that certain .evidence was improperly admitted, but the legal principles upon which the case was decided were impliedly approved, since the case was remanded for a new trial for the reason stated. Groh's Sons v. Groh, 177 N. Y. 8, 68 N. E. 992.

In Thompson on Corporations (2d Ed.) § 1074, it is said:

"The rule that the board of directors must act as a body or a unit is not iron-clad. It has already been seen that a by-law may be created by custom or usage. For similar reasons a board of directors may, by acting separately and in an individual capacity, establish a custom or usage that will be binding upon them and upon the corporation. Thus, where it appeared that from a long practice or a customary usage corporate business was transacted by securing the separate consent of the directors, or that the business was customarily transacted at either a casual or an informal meeting of the board, it was held as a matter of law to constitute a sufficient approval, in the absence of any law or by-law restricting the directors to a different mode. Am., etc., Bank v. First Nat. Bank, 82 Fed. 961, 27 C. C. A. 274; Powers v. Blue, etc., Ass'n (C. C.) 86 Fed. 705; Longmont Supply, etc., Co. v. Coffman, 11 Colo. 551, 19 Pac. 508; Stanley v. Luse, 36 Or. 25, 58 Pac. 75; Tenney v. East Warren, etc., Co., 43 N. H. 343. In a Vermont case it was held that the directors might bind their corporation by acting separately, if this was their usual practice in transacting corporate business. Bank, etc., v. Rutland, etc., R. Co., 30 Vt. 159. So it was held that stockholders might agree among themselves to distribute a certain sum as a dividend without taking formal action. Groh's Sons v. Groh, 80 App. Div. 85, 80 N. Y. Supp. 438. And, in the absence of creditors, it was held that the consent of directors and stockholders to a conveyance by the president of the corporate property was sufficient authority without any action by the directors as a board. Arkansas Pass Harbor Co. v. Manning, 94 Tex. 558, 63 S. W. 627. So it was held in Indiana that the directors acting separately could authorize the president to execute mortgages and other corporate instruments. Bank v. Sandford Fork, etc., Co., 157 Ind. 10, 60 N. E. 699. Another exception to this general rule requiring directors to act as a body is shown in a case where the directors themselves owned all the stock of the corporation, and authorized the president to sell all the assets, and it was held that it was immaterial that such authority was not given at a regular meeting of the directors. Jordan v. Collins, 107 Ala. 572, 18 South. 137. See Teitig v. Boesman, etc., Co., 12 Mont. 404, 31 Pac. 371. Acquiescence by the stockholders in the action taken by directors separately, and where such action was carried out by the corporation, was held sufficient to render the acts valid. Limer v. Traders Co., 44 W. Va. 175, 28 S. E. 730; Morisette v. Howard, 62 Kan. 463, 63 Pac. 756; Anderson v. Wallace Lumber, etc., Co., 30 Wash. 147, 70 Pac. 247. So the separate assent of a majority of the directors to the employment of a physician to attend an injured employé of the corporation, where a majority of them, including the officers, actively participated in the employment, and counselled with him concerning the care and treatment of the patient, was held sufficient to make such employment binding on the corporation. Scott v. Superior Sunset Oil Co., 144 Cal. 140, 77 Pac. 817."

In United States v. Milwaukee Refrigerator Transit Co. (C. C.) 142 Fed. 247, 255, the court said:

[3] "A corporation from one point of view may be considered an entity, without regard to its shareholders, yet the fact remains self-evident that it is not in reality a person or thing distinct from its constituent parts. The word 'corporation' is but a collective name for the members who compose the association. Home Fire Ins. Co. v. Barber, 67 Neb. 644, 93 N. W. 1024, 60 L. R. A. 927, 108 Am. St. Rep. 716; City of Nashville v. Ward, 16 Lea (Tenn.) 27; People v. North River, etc., Co. (Cir. Ct.) 3 N. Y. Supp. 401, 2 L. R. A. 33; Ford v. Chicago Milk Shippers' Ass'n, 155 Ill. 166, 39 N. E. 651, 27 L. R. A. 298; First Nat. Bk. v. Trebein Co., 59 Ohio St. 316, 52 N. E. 834; Buffalo

Loan, etc., Co. v. Medina Gas, etc., Co., 12 App. Div. 199, 42 N. Y. Supp. 781. If any general rule can be laid down in the present state of authority, it is that a corporation will be looked upon as a legal entity as a general rule, and until sufficient reason to the contrary appears; but, when the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime, the law will regard the corporation as an association of persons. This much may be expressed without approving the theory that the legal entity is a fiction, or a mere legal creation; or that the idea of invisibility or intangibility is a sophism. A corporation, as expressive of legal rights and powers, is no more fictitious or intangible than a man's right to his own home or his own liberty."

In sustaining certain acts of a corporation, although there was no formal meeting of its board of directors, in the case of Harbor Co. v. Manning, 94 Tex. 558, 63 S. W. 627, the court said:

"It was well held that, where the directors own all the shares, they may agree among themselves—not in their character of directors, but rather in their character of stockholders—to authorize the president to sell all the property of the corporation, and that this authorization will be none the less valid because not given at a regular directors' meeting. Other decisions tend to the conclusion that whilst, in theory of law, the corporation and its shareholders are distinct persons, and the latter have no agency for the former, yet equity, which looks to the substance of things, may, in an appropriate case, and for the purposes of justice. treat a debtor corporation and an individual owner of all its shares as identical."

[4] In the case at bar all of the facts and circumstances go to show that all of the appellants treated as profits of the business the withdrawals shown upon the books of the company to have been made by John M. Smith. By none of them, nor by the corporation itself, so far as appears, was it claimed that the annual debits shown against him were debts due the company. Mc-Naught, though available, was not produced as a witness by those called on to make the accounting. Flatt testified that the first entries he made in the books were made January 8, 1901. He was questioned and answered in respect to the entry of "December, By dividends, $7500," and the "D. I. to balance, $19,232.45" entry hereinbefore referred to, as follows:

"Q. I notice, Mr. Flatt, that on page 257 of the printed record an account entitled, 'Account of John M. Smith for 1900 to 1901,' that in December, on the credit side, there is an entry, 'December, By dividends, $7500?' A. Yes, sir.

"Q. Have you any explanation to offer as to that entry, Mr. Flatt, as to how it came there? A. Yes, sir; I have. It might take quite a little time to explain just exactly what that dividend meant.

"Q. I will ask you first what it was. Was it a dividend? A. No, sir; it was not.

"Q. Why was it not a dividend? A. Well, because there was never a dividend declared at that time when that entry was made. We expected to declare a dividend, but before that dividend was ever declared the business had changed altogether, and we never declared any. At that time I held an option on 100,000 shares of stock from John M. Smith, and we was to declare a 3 per cent. dividend each and every year, but before that time, with the outlook of the company and the proceeds that we had, I saw that I couldn't meet my payments in any way at all, and I had to let the option go back.

"Q. So that it simply represents a book entry? A. That is all, that is all there is to it.

"Q. Now, I notice in the printed record on page 261 an entry of December

1st: 'D. I. to balance, $19,232.45.' How, as a matter of fact, does that read? A. That is debtor to balance.

"Q. It should not be misunderstood to be dividends? A. Oh, no; nothing of that kind. That is debtor to balance."

Flatt was further questioned and answered as follows:

"Q. I will ask you, Mr. Flatt, when you became a stockholder in the company? A. In 1907.

"Q. About what time? A. Well, now, I don't know as I could just give the date, but it was possibly July or August. I think it was some time in there.

"Q. Now, did you hold any stock of the company prior to that time? A. I did, yes, sir.

"Q. How many shares? A. Fifty shares.

"Q. From whom, if any one, did you get that number of shares? A. From J. A. McNaught.

"Q. Who owned that 50 shares, if you know, who had held the title to it? A. Why, I suppose that J. A. McNaught did. Now, I never knew anything to the contrary.

"Q. Well, did you buy it from McNaught? A. No; I didn't. That is, at that time I never paid him any money for it.

"Q. Now, you were asked if you had ever filed any claims against the estate of John M. Smith. You said you had not? A. Yes, sir.

"Q. You said as far as you felt—how did you express it? A. I said that we had no claim against it.

"Q. When you said 'we,' whom did you mean? A. Meaning the company.

"Q. Why do you say that? A. Well, up prior to the time of 1907 John M. Smith was practically the owner of the company. He owned the largest amount of stock. Outside of his wife he really owned all of it, and each and every fall before he went away we had a meeting and went over the books and accounts and everything was settled up, and everything we didn't keep, and we always felt that we settled up each year as we went along, and that was satisfactory to everybody; but from 1907 on, when I became a stockholder and some others became stockholders, he had to balance his account every fall before he went away.

"Q. In other words, you felt, as I understand it, that you, after you bought your stock, had no claim as against John M. Smith for anything he owed the company prior to that time? A. Oh, sure, anything that John M. Smith got, any checks that he drew on the company or any checks drawed on him by the company for his own private use after 1907, he settled for every fall.

"Q. But, as to his account prior to that, you felt that whatever he owed the company, you had no claim on that? A. We had no claim on that whatever."

The explanation thus given by Flatt of the entries "By dividends, $7500," and "D. I. to balance, $19,232.45," cannot be accepted in the face of the fact that neither of those entries were carried forward into the debit account for the next or any succeeding year, any more than was the "P. & L. (manifestly meaning profit and loss) $17,507.02" entry, concluding the account for the year 1900. Flatt testified that in 1906 or 1907 he bought 25,000 shares of the stock from John M. Smith, and paid him a dollar a share for it. About the same time Napoleon B. Smith acquired 5,000 shares from John M. Smith by gift and 5,000 shares more by purchase from the latter's wife—the price not appearing. It is most significant that neither Flatt nor N. B. Smith then claimed that John M. Smith was then indebted to the company in more than $200,000 or in any other amount; nor did they so claim when shortly after that purchase a dividend of $25,000 out of the profits of the business was declared. The payment of any such indebt-

FEDERAL REPORTER

edness into the treasury of the company would naturally have greatly increased such dividends. Moreover, it appears that in the latter part of 1907 the Sheep Company executed to John M. Smith its promissory note for $10,499.50. We quote from the record the following in respect to that matter:

"Q. Well, Mr. Flatt, can you give us any information as to how that amount was arrived at, $10,499.50? A. I believe that that was just the size of a dividend check that was declared. Now, this is only an assumption.

"Q. There is a memorandum to that effect under date of September 16, 1907. Read that, please. A. 'Income by money borrowed from John M. Smith, turned over from his dividends, gave him company's note for same at five per cent. interest, payable annually.' And then I took that check that I got from him—that was a check—and I took that check and deposited it in the bank.

"Q. Now, the deposit is shown in the check-book under date of September 16th, is it? A. Yes, sir.

"Q. Well, Mr. Flatt, when you paid the interest on that a year after, you paid something over $1,200 apparently? A. I think that that was renewed by a new note, if the transaction—if I remember it right. We took up that old note of ten thousand four hundred and something and give a new note for an even ten thousand, and paid him the difference, with the interest. Now, that is just my recollection of the transaction."

It is impossible to reconcile such a transaction with the claim now made that John M. Smith was then indebted to the sheep company in a very large sum of money, in the absence of some satisfactory explanation, which is not given.

In addition to the foregoing considerations, it appears that no claim was ever presented by or on behalf of the Sheep Company against the estate of John M. Smith, and thus the right to enforce payment out of his estate, if such an obligation existed at his death, has been lost by the negligence of the appellants Mary M. Smith and N. B. Smith, and of Flatt, the directors of the company. Flatt was questioned and answered in respect to that matter, as follows:

"Q. Now, Mr. Flatt, you have continued in office as secretary (of the company), of course? A. Yes, sir.

"Q. And I wish you would tell the court, if you please, whether you have ever filed any claim on behalf of the Smith Bros. Sheep Company against the estate of John M. Smith? A. No; I never did, or I never had anything to file on.

"Q. That is to say, you had no claim? A. No, sir.

"Q. That is to say, at the time of the death of John M. Smith, you did not calculate that he was owing Smith Brothers Sheep Company anything? A. Not the way we calculated the business he wasn't.

"Q. Anyway, you didn't file any or present any statement or claim? A. No, sir."

We are of the opinion that there is no merit in the appeal, and the judgment is accordingly affirmed.