## ZENITH MILLING CO. v. LUCAS, Commissioner of Internal Revenue.

### No. 8416.

Circuit Court of Appeals, Eighth Circuit.
May 27, 1930.

Rehearing Denied July 22, 1930.

Harry L. Donnelly, of Kansas City, Mo., and Perry W. Shrader, of Washington, D. C., for appellant.

Millar E. McGilchrist, Sp. Asst. to Atty. Gen. (Mabel Walker Willebrandt, Asst. Atty. Gen., J. Louis Monarch, Sp. Asst. to Atty. Gen., and C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and Shelby S. Faulkner, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., on the brief), for appellee.

Before BOOTH, Circuit Judge, and SANBORN and DEWEY, District Judges.

SANBORN, District Judge.

This appeal involves excess profits taxes for the year 1919, and comes to this court upon a petition to review a decision of the Board of Tax Appeals entered January 20, 1928. 8 B. T. A. 1279. The amount of the tax was directly affected by the amount of appellant's invested capital.

The appellee concedes that the appellant should have been allowed an invested capital of $75,000 ($50,000 capital and $25,000 surplus). The appellant claims that, in addition, it should have been allowed as invested capital $194,887.55, made up of $84,992.47, the amount contributed by the trustees of a predecessor corporation on February 8, 1907, and the earnings of the appellant since that time, which were credited on its books to, but not drawn out by, its stockholders.

As shown by the findings of the Board, the facts are as follows:

In 1880, the first Zenith Milling Company, a Missouri corporation, was organized, with a capital stock of $50,000. It took over the milling business previously conducted by L. M. Miller, C. A. Young, and L. S. Mohr, a partnership. Miller and Mohr were brothers-in-law, and Mohr and Young were cousins. The assets of the partnership taken over were set up on the company's books at $50,-000. All of its capital stock was issued to the partners. The charter of the company expired on June 19, 1905. The business was, however, carried on as formerly. Miller, on November 10, 1906, transferred his 167 shares of stock to Mabel A. Miller, his wife. Early in 1907 and before her husband's death, Mrs. Miller had trouble with Mohr over her withdrawal of money from the business. Attention was then directed to the expiration of the charter. The appellant company was organized on February 8, 1907, under the same name, with $50,000 capital (500 shares of $100 each). The incorporators were: L. S. Mohr, with 249 shares; C. A. Young, 250 shares; Paul M. Mohr, 1 share. There was no change in the business, which continued on as theretofore. On March 1, 1907, a resolution of the board of directors provided that the appellant should purchase all the assets of the defunct Zenith Milling Company from its surviving trustees, the consideration to be the issuance to the stockholders of the defunct company of the same amount of stock in the new company as each had held in the old, to wit, 167 shares to Mrs. Miller, 167 shares to Young, and 165 shares to Mohr. Mrs. Miller declined her stock, and on September 12, 1907, the directors of appellant adopted a resolution reciting the transfer by Miller of his stock in the old company to his wife, the desire of the

new company to purchase her interest in the property of the old company for $50,000, and her willingness to accept that amount. The resolution directed the president to make the purchase of this stock from Mrs. Miller by paying $25,000 in cash, the balance to be paid by the giving of promissory notes, and directed the cancellation of the certificate for 167 shares of the stock of the new company to her, and the sale of this stock to Lewis S. Mohr and Charles A. Young for value (the amount paid Mrs. Miller), and provided that "said sum of money be placed to the credit of the capital stock of this Company on its books, so that the entire capital stock of this Company as it appears from this date is as follows: Lewis S. Mohr 249 shares, Charles A. Young 250 shares and Paul M. Mohr 1 share, and all of which said capital stock is now fully paid up." Mrs. Miller was paid in accordance with this resolution, and Mohr and Young acquired her stock.

On September 14, 1907, Mohr and Young entered into an agreement reciting that they were the owners of the entire capital stock of the appellant company; that Mohr desired that his son Paul M. Mohr should have 70 shares of stock; that therefore Paul might purchase 70 shares at $150 per share, and deliver to Mohr and Young his note for $10,500, due one day after date, with interest at 6 per cent. per annum, in consideration therefor. The agreement also recited that it was the desire of Young that his son Nathan should have 70 shares of stock upon his majority, and that, when that event occurred, Mohr and Young would sell him 70 shares upon the same terms, and that, if Nathan should not purchase the stock, there should be a readjustment of stock ownership, "it being the understanding and purpose of this agreement that said Lewis S. Mohr, together with Paul M. Mohr and Charles A. Young together with Nathan Young shall be the owners of two hundred and fifty (250) shares each in said corporation, and both said Lewis S. Mohr and Charles A. Young at any meeting of the shareholders shall be entitled to vote two hundred and fifty shares each." The agreement further provided:

"No dividend earned on said stock shall be paid at any dividend-paying time to any share-holder in said corporation until said Lewis S. Mohr and Charles A. Young shall each have received a credit of Fifteen Hundred ($1500) Dollars per annum each, the same being for interest in said working cap-ital that said Lewis S. Mohr and Charles A. Young have respectfully furnished to said corporation."

The agreement further recited that, in case of the death of either Mohr or Young, the survivor should have the privilege of purchasing the stock of the deceased within one year thereafter at the price of $200 per share, and that the running capital to the credit of Lewis S. Mohr and Charles A. Young, or what might be to the credit of each at that time, could not be withdrawn from the corporation within one year thereafter; and that all of the capital stock of the corporation, together with the note of Paul M. Mohr, was then deposited with the president of the First National Bank of Kansas City, to be held by him and not with-drawn, except upon the written consent of both Mohr and Young. It was further agreed that Paul M. Mohr should be entitled to all dividends on stock purchased by him that might be thereafter declared, but that for the six months ending December 31, 1907, he should only have his proportionate share of said earnings from the date of the agreement. The dividends arising upon the remaining 430 shares of capital stock, until Nathan Young should purchase the 70 shares mentioned in the agreement, were to be equally divided between Lewis S. Mohr and Charles A. Young.

Paul M. Mohr purchased the 70 shares of stock mentioned in the agreement and gave one note to L. S. Mohr for 35 shares at $150 a share, and another note to C. A. Young for an equal number of shares at the same price. The notes were payable out of the earnings of the company or from any other money obtained from outside sources, and were so paid.

At no time was a dividend ever declared, nor did the company have a surplus account on its books, but twice each year profits were determined and the amount thereof credited to the individual accounts of the stockholders in proportion to their holdings. Machinery and other assets acquired by the corporation were charged against the accounts of the stockholders in proportion to their holdings. Some time after the incorporation of the original company in 1880, Miller, Young, and Mohr had agreed among themselves that each would keep to his account a minimum credit of $25,000 for the company's use as an operating fund, and prior to Miller's death the credit was not reduced much below that amount. The credit of $1,500, which, by the

agreement of September 14, 1907, was to be added to the accounts of C. A. Young and L. S. Mohr, was interest on the earnings as credited to their accounts.

The minutes of the meeting of the board of directors of April 6, 1908, contained the following statement:

"Because of differences in the matter of the holdings of the widow of Lewis M. Miller, our former President, it seems best that there should be a statement spread upon the minutes of the company, regarding the running capital of the company which is clearly understood by us to-wit: 'That the amounts standing to the credit of L. S. Mohr and C. A. Young, constitutes our running capital and in no manner removable, without the joint consent of both parties, and that the interest credited before profits are divided is in no sense interest for borrowed money, but for the purpose of equalizing our respective. interests in the capital referred to.' "

The books indicate that on February 28, 1907, and on December 31, 1918, the stockholders' accounts had credit balances as follows:

|  | Feb. 28, 1907 | Dec. 31, 1918 |
|---|---|---|
| L. M. Miller | $25,800.32 |  |
| L. S. Mohr | 28,716.59 | $133,968.96 |
| C. A. Young | 30,475.56 | 60,918.59 |
|  | $84,992.47 | $194,887.55 |

With reference to the item of $84,992.47, which stood upon the books of the old company to the credit of stockholders, the Board of Tax Appeals has this to say (8 B. T. A. 1287):

"The amounts credited to the shareholders' accounts represented earnings of the corporation which were taken from the corporate assets. They then became separated from corporate assets and became the property of the stockholders. It was available to them. This is not a case of mere bookkeeping entries, but the actual earnings were available for distribution and were credited to each stockholder as his separate property. In order to be included in the corporate assets, therefore, such earnings so distributed must be turned back to the corporation.

"From all the evidence, we are unable to find that the stockholders' credits were paid into the corporation so as to constitute paid-in surplus within the meaning of the Act."

With respect to the earnings credited to the stockholders from the time of the formation of the appellant corporation to December 31, 1918, the Board's conclusions were these (8 B. T. A. 1288):

"In the instant case, we are of the opinion that the semiannual crediting of petitioner's profits to the accounts of its stockholders constituted such a distribution thereof as to prevent their being a part of the corporation's surplus and as such a part of its invested capital. In the light of the facts in this case, we are of the opinion that the credit balances of the stockholders belonged to them and not to the corporation. When used by the corporation they constituted borrowed capital and therefore under the Act may not be included in invested capital. To the extent that the stockholders contributed any amounts from their credit balances to the corporation in payment for assets bought by the corporation they constituted paid-in surplus."

The sole question we are asked to determine is whether the amounts credited to the stockholders were "invested" or "borrowed capital."

The Revenue Act of 1918, c. 18, 40 Stat. 1057, 1091, § 325 (a) provided:

"That as used in this title—* * * 

"The term 'borrowed capital' means money or other property borrowed, whether represented by bonds, notes, open accounts, or otherwise. * * *"

Section 326(a) provided:

"That as used in this title the term 'invested capital' for any year means (except as provided in subdivision (b) and (c) of this section):

"(1) Actual cash bona fide paid in for stock or shares;

"(2) Actual cash value of tangible property, other than cash, bona fide paid in for stock or shares, at the time of such payment, but in no case to exceed the par value of the original stock or shares specifically issued therefor, unless the actual cash value of such tangible property at the time paid in is shown to the satisfaction of the Commissioner to have been clearly and substantially in excess of such par value, in which case such excess shall be treated as paid-in surplus; * * *

"(3) Paid-in or earned surplus and undivided profits; not including surplus and undivided profits, earned during the year; * * *

"(b) As used in this title the term 'invested capital' does not include borrowed capital. * * *"

Regulations 45 of the Treasury Department, art. 813, provided:

"Borrowed capital; amounts left in business.—Whether a given amount paid into or left in the business of a corporation constitutes borrowed capital or paid-in surplus is largely a question of fact. Thus, indebtedness to stockholders actually cancelled and left in the business would ordinarily constitute paid-in surplus, while amounts left in the business representing salaries of officers in excess of their actual withdrawals, or deposit accounts in favor of partners in a partnership succeeded by the corporation, will be considered paid-in surplus or borrowed capital according to the facts of the particular case. The general principle is that if interest is paid or is to be paid on any such amount, or if the stockholder's or officer's right to repayment of such amount ranks with or before that of the general creditors, the amount so left with the corporation must be considered as borrowed capital and be so treated in computing invested capital."

In Spencer v. Lowe, 198 F. 961, 966, this court said:

"We hold that when all the stockholders, including all the directors of a solvent corporation, meet and agree to a division of profits, and they are credited to the several individual stockholders upon the books of the company, and subsequently some of the stockholders withdraw their shares in whole or in part, that is the equivalent of a dividend. The claimant was therefore entitled to the dividends credited to him which did not impair the capital stock. * * *

"Where a corporation is created for the purpose of merchandising, while it has no power to declare dividends except out of net profits, it does not follow that its book accounts against parties to whom merchandise has been sold in the ordinary course of business and concerning which there is no question may not be included in the assets of the company in determining whether there has been a net profit or not. There is no evidence that any of the dividends credited to the stockholders did in fact impair the capital."

See, also, Barnes v. Spencer & Barnes Co., 162 Mich. 509, 127 N. W. 752, 139 Am. St. Rep. 587; Atherton v. Beaman (C. C. A.) 264 F. 878; Smith v. Moore (C. C. A.) 199 F. 689.

In Southwestern Railway Co. v. Martin, 57 Ark. 355, 21 S. W. 465, a report was made by the president of the company showing profits and the amount each stockholder would be entitled to, and a resolution was offered that profits be distributed according to such report. The minutes failed to show the adoption of the resolution, but the books showed payments to the other stockholders aside from the plaintiff as if the resolution had been adopted, and it was held that an action by the plaintiff would lie for his dividends.

In this case it seems reasonably clear that when Mrs. Miller sold out to Mohr and Young, she was paid $25,000 for the stock to which she was entitled, and $25,000 for her credit on the books of the corporation. It also seems clear that when Paul M. Mohr bought into the company at $150 a share, his stock was not regarded as giving him any interest in the credits to "stockholders' accounts." The agreement between Mohr and Young with reference to the right of the survivor to purchase the stock of the other at $200 a share was not intended to give the survivor any rights to the "stockholders' accounts," since there is a provision against such accounts being withdrawn within one year after the death of either Young or Mohr. Regardless of whether it be called interest or not, an amount was credited upon the books to Young and Mohr each year for the purpose of compensating them for leaving their credits in the business, and was the equivalent of interest. They contracted between themselves as to the withdrawal of their credits "without the joint consent of both parties," and made it a matter of record on the minutes of the corporation. It is evident therefore, that as between Lewis S. Mohr and C. A. Young and the corporation, it was understood that they were creditors of the corporation to the extent of their credits. These credits could not properly be called surplus, since they were not so regarded or dealt with by the corporation or by the stockholders themselves, and the stock outstanding did not represent pro rata ownership of the amounts so credited.

The United States Supreme Court, in Willcuts v. Milton Dairy Co., 275 U. S. 215, 218, 48 S. Ct. 71, 72, 72 L. Ed. 247, said:

" * * * The term 'surplus' describes such part of the excess in the value of the corporate assets as is treated by the corporation as part of its permanent capital, usually carried on the books in a separate 'surplus account;' while the term 'undivided profits' designates such part of the excess as consists of profits 'which have neither been

distributed as dividends nor carried to surplus account.'"

These credits to stockholders were not "treated by the corporation as part of its permanent capital" on its books or otherwise. See, also, Southport Mill v. Commissioner of Internal Revenue (C. C. A.) 26 F.(2d) 17.

It is unnecessary to determine whether the rights of Mohr and Young were superior to those of creditors who had extended credit to the corporation upon the belief that the credits to stockholders constituted "invested capital." That question might involve some elements of estoppel. It is not unreasonable that the government should treat the amounts credited to stockholders in the same way that those who owned the stock and controlled the affairs of this corporation had themselves treated them, not only by way of bookkeeping, but in their actual dealings between themselves and the corporation.

Appellant relies largely upon the cases of Eaton v. English & Mersick Co. (C. C. A.) 7 F.(2d) 54; Davidson & Case Lumber Co. v. Motter (D. C.) 14 F.(2d) 137; Flynn v. Haas Bros. (C. C. A.) 20 F.(2d) 510; Geo. Feick & Sons Co. v. Blair, 58 App. D. C. 168, 26 F.(2d) 540.

In Eaton v. English & Mersick Co., supra, it appears that a resolution was adopted by the directors of the English & Mersick Company, providing that net profits be divided among the stockholders and the proportionate amounts credited to their individual surplus accounts. It was held that this did not constitute a dividend in the absence of a provision for payment at any particular time by setting aside a sum therefor; there being no intent to declare a dividend in accordance with the state law under which the corporation was organized. The stockholders had actually been credited with profits on the books. The court held that there had never been any division of the surplus, and that the stockholders could not loan what they had at no time owned or received, and that the credits to stockholders constituted "invested" and not "borrowed capital."

In Davidson & Case Lumber Co. v. Motter, supra, it appears that on December 31, 1917, the net accrued profits of the business of the lumber company, as shown by its books, amounted to about $150,000, and that, as of that date, that sum was credited to the individual accounts of the stockholders, but was in fact at no time paid by the corporation to them or declared as a cash dividend on their stock. It remained in the business until June 22, 1918, on which date the capital stock was increased, and a stock dividend to the amount of $150,000 was declared. The government's contention was that from December 31, 1917, to June 22, 1918, while the profits were credited to the stockholders' accounts, they were "borrowed capital." The court held that, while this amount was credited to the stockholders on the books in proportion to the stock owned by them, it still remained under the control of the corporation and was tied up in its corporate property and used for its corporate purposes as fully as before, as it never passed from the corporation to the stockholders by the declaration of a dividend, and that, if it had been lost or destroyed, the loss would have fallen upon the corporation and not upon the stockholders; that it was therefore "invested" and not "borrowed capital."

In Flynn v. Haas Bros., supra, the facts were, in substance, these: Haas Bros., a family corporation, in the year 1916 had earned a profit of about $290,000. On January 8, 1917, the directors adopted a resolution declaring a cash dividend from the reserve account of $480 a share, payable pro rata to the stockholders of record on January 1, 1917. The District Court found that the resolution declaring the dividend did not express the true intent of the board of directors, and that in adopting the resolution the board merely followed a precedent in form and language established in previous years; that they understood and believed that a dividend was declared when actually paid out of cash on hand available for that purpose, and not before; that they knew that the company had no funds out of which to pay dividends, and did not know that the resolution would impose any obligation upon the company, and did not intend that it should; that no part of the dividend as declared was ever actually distributed or set apart for the benefit of the stockholders; that the corporation had no cash available with which to pay the dividend; that the earned profits consisted of merchandise on hand and accounts due from customers, and no physical division or allocation of the property was ever made to the stockholders. The Court of Appeals held that the amount of the dividend declared by the resolution of January 8th did not cease to be a part of the "invested capital" of the corporation from and after the date of the resolution.

In Geo. Feick & Sons v. Blair, supra, the Court of Appeals of the District of Columbia held that, where a corporation kept per-

910

sonal accounts for each of the individual stockholders, and the share of the surplus dividends and portions of the salary that remained in the business were credited to each of the individuals upon the books and where the records of the corporation contained no entry to the effect that the accumulated salaries and dividends were to be kept in the business, but this was done by oral agreement between the individual officers, and where the amounts shown each year on the books to be due to each of the individual stockholders and standing to their credit were not represented by notes and no interest was paid on the amounts, these credits constituted "invested" rather than "borrowed capital." The court said [26 F.(2d) 540, 541]:

"It is elementary law that before title to a dividend passes to the stockholder there must be a declaration of a dividend; and the fund for its payment must be separated from the capital or surplus profits of the corporation. When this is done, it becomes the property of the stockholder, and a debt of the corporation on which the stockholder may recover, and it is likewise exempt from action by creditors of the corporation."

We cannot subscribe to the theory that under no circumstances can a solvent corporation constitute itself a debtor to its stockholders to the extent of profits properly credited to them on its books unless and until its directors formally declare a dividend and segregate cash or certain specific assets to be applied to its payment.

In this case, those stockholders who drew against their credits did not appropriate corporate funds, but merely took what the corporation acknowledged it owed them. The crediting of interest was not present in the cases cited by appellant, nor was the amount of profits left in the business by one stockholder so greatly out of proportion to the amounts left by others as in this case. Concededly, mere bookkeeping would not transform "invested capital" into "borrowed capital."

We reach the conclusion that, upon the record, the question as to whether the amounts of the credits to stockholders representing profits left in the business by them constituted "borrowed" or "invested capital" was a question of fact, and that there was substantial evidence to justify the findings of the Board. It is conceded that the tax should be computed on the basis of an invested capital of $75,000, which was not done. In all other respects the determination of the tax is affirmed.